(No. 34023.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT BURSON, Plaintiff in Error.

*Opinion filed May 23, 1957.*

EUGENE T. DEVITT, of Chicago, JOHN HEIMDAL, and LESTER GALVIN, both of Aurora, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN C. FRIEDLAND, State's Attorney, of Elgin, (FRED G. LEACH, BEN RIFKIN, and JOHN S. PETERSEN, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

After trial by jury in the circuit court of Kane County, Robert Burson was convicted of murder and sentenced to death. He sued out writ of error to review the judgment, and the errors assigned and argued here are: (1) that the trial court deprived the defendant of the effective assistance of counsel of his choice; (2) that defendant's constitutional rights were violated by the court's refusal to allow defendant to dispense with appointed counsel and conduct his own defense; (3) that the court erred in admitting certain evidence, and (4) that the evidence is insufficient to sustain the conviction. The record presents unusual conduct of the defendant, prior to and during the trial, which will be related and considered before the errors assigned.

The indictment charged the defendant with the murder of Harriet Montgomery, a woman 76 years of age, who was found dead in the bedroom of her home on August 4, 1955. Death was attributed to crushing head injuries produced by a blunt instrument. Ann Burson, the estranged wife of the defendant who had been living in the home of the deceased, had been separated from her husband for several months. Upon arrest, the defendant gave a statement to the police in which he denied the murder; told of his rejected love for his wife, and of her statement that he needed psychiatric care; and that he had sought to visit his wife but Mrs. Montgomery had refused him permission to enter the house. While thus frustrated in his efforts toward reconciliation, the defendant turned against

his own relatives. He made threats against a brother-in-law and wife, a sister, a brother and sister-in-law, as well as Mrs. Montgomery. From these facts, it appears that the defendant, prior to his arrest, had developed fixed ideas of persecution which caused him to threaten retaliation against those supposedly opposing this reconciliation.

The indictment was filed on September 12, 1955. Two days later he appeared with E. A. Simmons, an impostor attorney, was arraigned and entered a plea of not guilty. Trial was set for October 24, 1955, and was thereafter continued. On December 5, 1955, Homer C. Griffin, an attorney, appeared on behalf of defendant and obtained a further continuance to December 7, on the ground that Simmons was ill. On that date attorney Griffin again appeared and assigned the same ground for further continuance. The State's Attorney then suggested that Simmons was not a licensed attorney, and filed a petition to produce Simmons in court. The case was continued to December 12, at which time it appeared that Simmons could not be located, and the State's Attorney then suggested the appointment of the public defender. The defendant objected and stated that he had funds and would talk to his relatives about the employment of an attorney. The case was then continued to December 16. The defendant contacted an attorney named Farrari, who could not appear on this date, and further time was given defendant. On January 3, 1956, the defendant, again present in court without an attorney, stated that he had dismissed Farrari and sought continuance to January 13. The court granted the continuance but appointed the public defender and attorney John Heimdal to represent the defendant, and advised him that if he secured his own counsel substitution could be made. The defendant objected and refused to accept appointed counsel. On January 13, the matter again came on for hearing, and appointed counsel advised the court that they had been to the jail repeatedly, but the defendant had refused to talk

to them. The defendant admitted this, and again stated that he had counsel and did not need their assistance. He requested a further continuance to prepare his case; advised the court that his counsel would not be present until the exact date of the trial; and stated that he did not desire the services of appointed counsel even though his own counsel should fail to appear. The court then continued the case to February 13, and stated that it would go to trial on that date, whether or not defendant's counsel was present, and that the public defender and attorney Heimdal would be available if defendant wished their services.

Before the trial began, defendant's appointed counsel again sought a continuance on the ground that they had not had sufficient time to prepare the case because, except for the last four days, defendant had refused to talk to them. The public defender advised the court that the defendant, by virtue of his experience with Simmons, was distrustful of all counsel and people generally; and that counsel believed that they now had his confidence and cooperation and could prepare his defense if given time. The defendant then told the court that, when he had previously stated that he had counsel, he was referring to spiritual counsel; that he had been preparing to try his own case; and that if he did not get an attorney, he would still reject appointed counsel. An argument then ensued between the court and the defendant as to his right to reject counsel, one of whom then sought to withdraw from the case. The court denied the request and told the defendant that his rejection of counsel would not be accepted; that the court had appointed competent counsel and they would have to serve. The court denied the motion for continuance, whereupon the defendant asked the court whether he believed in God, and said "I will say that when the day of reckoning comes, you people who have shown me no leniency, shall also be shown none on reckoning day by God."

The defendant participated in the *voir dire* examination of the jurors and inquired at length as to their religious beliefs and experiences. Typical examples of the questions asked were: "Do you believe in God?" "Do you believe in the inspired word as written in the Bible?" "Have you read the Old Testament?" "Have you read the New Testament?" "Do you believe in Jesus Christ as the son of God?" "Have you ever been born again?" Many of the jurors, obviously perplexed by this interrogation, asked for his interpretation of being "born again." The defendant then explained his conception of salvation by quotations from the Bible, to which objections were sustained; and he frequently became argumentative.

The possible insanity of the defendant was first mentioned by one of his counsel in opening argument. The State's Attorney immediately objected on the ground that such defense had not been specially pleaded, and a lengthy argument then took place in chambers as to the manner in which the issue of insanity might be presented. The record indicates that neither court nor counsel differentiated between the question of insanity at the time of the alleged offense and at the time of trial. During this discussion, one of defendant's counsel stated that they had the right "to have a prior hearing on the issue whether insanity does exist, not only preliminary to assigning it on the issues, but whether this man is able to go ahead with the defense." The State's Attorney then argued that the defense of insanity had to be properly raised prior to trial. The court remarked that, if petition had been filed prior to trial, it would have been his duty to first determine the issue of sanity before trying the defendant on the indictment, but "We are now embarked on the trial of the indictment to determine the guilt or innocence of the defendant," and the court ruled that the defendant was entitled to raise any defense he saw fit on the trial, including the defense of insanity at the time of the commission of the offense. The

defendant, who was present during this colloquy, protested vigorously that he was sane and stated that in no case would he plead any type of insanity to the charge. However, in his opening statement to the jury, the defendant mentioned the subject of insanity; stated that he had been examined by two psychiatrists; and that he did not know "of any time that I knew to any extent that I was insane." He also made it clear to the jury that counsel were there representing him because the court appointed them and not because he wanted them, and said: "I was supposed to appeal my own case and I am doing just that."

Throughout the two-week trial, defendant persisted in arguing with the court, the State's Attorney and his appointed counsel in the presence of the jury. He characterized the court's adverse rulings on evidence as efforts on the part of the court to conceal the true facts and to aid the prosecution. His distrust of his appointed counsel increased as the trial progressed, even though the record reflects a conscientious effort on their part to properly represent him. The climax came when the defendant called his attorneys, as witnesses, to prove that they failed to give him their full support because of bargaining, collusion, prejudice and political pressure, and that he had objected to their representation throughout the trial. He examined both of them at length in a highly insulting manner. After the defendant had examined attorney Heimdal, public defender Galvin objected to being called as a witness on the ground that the tactics being pursued would damage the defendant's case before the jury, but the court compelled him to testify. At one point in the interrogation, the defendant said: "Speak up, Mr. Galvin, if you have any guts," and in conclusion stated: "I have only one thing further to say, Mr. Galvin, that I would rather be in my shoes 100 times over than be in your shoes."

Defendant made his own closing argument to the jury. It was, for the most part, a long and rambling dissertation

covering his own religious beliefs, the sinfulness of man's nature, the need for salvation and his opinions on the theory of evolution. In closing he told the jury that he was innocent, but if they found him guilty he wanted the extreme penalty of death in the electric chair. He objected to all instructions tendered by his counsel, both during conferences thereon and later, on the ground that he had neither approved nor read them. His counsel offered two instructions on the subject of insanity, to which defendant offered particular objection, and, the court, in refusing these instructions, stated it was acting in accordance with defendant's wishes. However, the court gave other instructions tendered by defense counsel to which the defendant had likewise objected.

At the presentation and argument of the motion for a new trial, the defendant tore the amended motion into pieces and objected to the filing of a carbon copy. The motion alleged, *inter alia,* "that the defendant was insane at the time of commission of the offense as charged, and also insane at the time of trial, and is now insane," and that "the court erred in not causing a determination to be made whether or not defendant was sane when it appeared in the course of the trial that defendant was not sane or might not be sane." The motion was supported by the affidavit of counsel which stated that during the course of the trial it became apparent to them that defendant was in dire need of mental care and might be insane. The affidavit recited that counsel's belief that the defendant is insane was based, in part, on information, received after the trial, from members of the defendant's family; that such information might lead a jury to believe the defendant insane, and would be available in event a new trial should be granted. The defendant characterized the statement that he was insane as nothing but a lie, and then proceeded to read the entire seventh, and part of the sixth, chapters of the Gospel of Matthew, after which he again accused his coun-

sel of prosecuting him and said: "You hate God's word, and therefore you hate me. If you do not believe God's word, you do not believe mine either for I have declared I am the son of God." During the argument of the motion for new trial, the defendant made repeated interruptions and objections, and had the last word when he said: "I know when I die I will go to heaven but I don't know about you folks." In overruling the motion for a new trial the court stated that it believed the defendant to be sane.

The trial, adjudication, sentence, or execution of a person charged with a criminal offense, while insane, is a violation of due process of law, (*People* v. *Reeves,* 412 Ill. 555; *People* v. *Maynard,* 347 Ill. 422,) and is expressly prohibited by sections 12 and 13 of division II of the Criminal Code. (Ill. Rev. Stat. 1955, chap. 38, pars. 592 and 593.) The statute providing for a sanity hearing does not, and was not intended to, abrogate the common-law rule that no person should be compelled to stand trial while insane. (*People* v. *Maynard,* 347 Ill. 422; *People* v. *Gavrilovich,* 265 Ill. 11.) A formal petition for such hearing prior to trial is unnecessary to afford a defendant the protection of the statute and his rights at common law. We have decided that the question may be raised by oral suggestions of counsel during the trial, and if made in good faith, it becomes the duty of the court to conduct a hearing before a jury upon the issue, and the denial thereof is a violation of due process. (*Brown* v. *People,* 8 Ill.2d 540.) These views are in accord with the rule in other jurisdictions. In 14 Am. Jur., sec. 44, page 801, it is stated: "The rule at common law and by statute in many jurisdictions is well settled that a person while insane cannot be tried, sentenced, or executed. It is obvious that if tried while insane, his insanity may disable him from making a rational defense. Hence, both at common law and by statute in many jurisdictions, if, at any time while criminal proceedings are pending against a person accused of a crime,

whether before, during, or after the trial, the trial court, either from observation or upon the suggestion of counsel, has facts brought to its attention which raise a doubt of the sanity of the defendant, the question should be settled before further steps are taken."

When the question of sanity at the time of trial is raised, the issue presented is whether the defendant has the capacity to make a rational defense. (*People* v. *Lewis,* 2 Ill.2d 328, 331; 44 C.J.S., sec. 124, page 282.) He should be capable of understanding the nature and object of the proceedings against him, his own condition in reference to such proceedings, and have sufficient mind to conduct his defense in a rational and reasonable manner, although upon other subjects his mind may be unsound or deranged. (*People* v. *Geary,* 298 Ill. 236, 245; 14 Am. Jur., sec. 44, pages 802 and 803.) In order to conduct his defense in a rational and reasonable manner he should be capable of co-operating with his counsel to the end that any available defenses may be interposed. *Glenn* v. *People,* 9 Ill.2d 335, 343; Ann., 3 A.L.R. 94.

The record in this case raises serious doubt concerning the defendant's sanity at the time of his trial. He appears to have been possessed of a persecution complex pertaining to his relation with man, and of delusions of grandeur in connection with his identification with God. In view of his exalted beliefs and irrational conduct, it must have become apparent to his counsel, the State, and the court, before and as the trial progressed, that he was neither capable of co-operating with his counsel, of giving them the assistance necessary to a proper defense, nor of defending himself. When such facts became evident, the issue of sanity was raised, and it was the duty of counsel for defendant and the State to request a determination of the defendant's sanity. We believe that the suggestion of insanity by defense counsel, the defendant's departure from the general rules governing human conduct, and his exalted beliefs raised the sanity

issue; and that the court abused its discretion in refusing to direct a sanity hearing pursuant to statute. The court did not discharge its duty under the statute by taking the defendant's word as to his sanity, or by substituting its judgment for that of a jury. (*Brown* v. *People*, 8 Ill.2d 540; *People* v. *Maynard*, 347 Ill. 422.) When, before or during the trial, facts are brought to the attention of the court, either by suggestion of counsel or the State, or by its own observation, which raise a *bona fide* doubt of the defendant's present sanity, a duty devolves upon the court to then cause a sanity hearing to be held as provided by law.

In the motion for new trial, after verdict and before judgment, the court was again advised that counsel believed that defendant had been insane during his trial and was then insane. It was then the duty of the court under section 13 of division II of the Criminal Code, (Ill. Rev. Stat. 1955, chap. 38, par. 593,) to conduct a jury trial upon the issue before pronouncing judgment. The fact that the issue was presented by a motion for a new trial rather than by a formal petition for such a hearing is immaterial. (Ann., 10 A.L.R. 213; Cf. *Brown* v. *People*, 8 Ill.2d 540; *People* v. *Maynard*, 347 Ill. 422.) The failure of the court to afford the defendant a hearing on the question of his sanity during the trial and after verdict was a denial of due process.

We recognize that counsel for defendant did not present or argue this point; and that the general rule is that where a question is not raised or reserved in the trial court, or where, though raised in the lower court, it is not urged or argued on appeal, it will not be considered and will be deemed to have been waived. However, this is a rule of administration and not of jurisdiction or power, and it will not operate to deprive an accused of his constitutional rights of due process. "The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which de-

prived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented." 3 Am. Jur., sec. 248, page 33; *United Brotherhood of Carpenters* v. *United States,* 330 U.S. 395, 91 L. ed. 973; *People* v. *Jung Hing,* 212 N.Y. 393, 106 N.E. 105; *State* v. *Griffin,* 129 S.C. 200, 124 S.E. 81.

Since this case must be remanded for a new trial, we will consider the errors assigned as they may again arise. The first concerns an alleged denial of the right of the defendant to secure counsel of his choice. Section 9 of article II of the Illinois constitution provides that "in all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel," which includes the right to employ counsel of his own choice. (*People* v. *Cohen,* 402 Ill. 574.) It is also mandatory that the accused be given a full opportunity to select and employ his own attorney. (*People* v. *Williams,* 399 Ill. 452.) The record shows that defendant's rights in this connection were well protected. Five months elapsed between arraignment and trial. He was given repeated continuances to enable him to secure counsel of his choice. The court appointed counsel early in January but advised the defendant that he might substitute counsel of his own selection at any time. During the six weeks prior to trial the defendant misled the court by frequently stating that he had an attorney, when in fact he referred only to "spiritual counsel," and thereby sought additional time to prepare his own defense. Under the circumstances, the court did not err in denying the request.

The contention that the trial court erred in appointing counsel for the defendant, against his wishes, and deprived the defendant of his right to conduct his own defense, poses a more difficult question. The defendant objected to the appointment of counsel at the outset and rejected such counsel during the entire course of the trial. He re-

peatedly stated that he was prepared and preferred to conduct his own defense. The trial court allowed the defendant to participate in the trial but insisted that the appointed counsel take part also, which procedure was followed. This dual representation at the trial, without co-operation between defendant and his counsel, ended in judicial turmoil.

Section 9 of article II of the constitution guarantees to an accused in a criminal prosecution the right to appear and defend himself. Section 2 of division XIII of the Criminal Code provides that every person charged with crime shall be allowed counsel, and when he states on oath that he is unable to provide counsel the court shall assign him competent counsel to conduct his defense; and that whenever it shall appear to the court that a defendant indicted in a capital case is indigent, it shall be the duty of the court to appoint competent counsel who shall be paid by the county as therein provided. (Ill. Rev. Stat. 1955, chap. 38, par. 730.) In People v. Williams, 399 Ill. 452, at 455 and 456 we held: "The statute is explicit in the command, and if a defendant charged with a capital offense is found to be indigent the court must appoint counsel to aid him, unless the defendant waives the right to counsel. The condition on which a waiver may be accepted is that it shall represent a competent and intelligent act by one having a full knowledge of his right to counsel." (Also see Ill. Rev. Stat. 1955, chap. 110, par. 101.26.) The right to be represented by counsel in either a capital (People v. Carter, 391 Ill. 594; Carter v. Illinois, 329 U.S. 173, 91 L. ed. 172,) or noncapital case is one which the defendant may claim or waive as he shall determine. (People v. Ephraim, 411 Ill. 118; People v. Lannery, 408 Ill. 121; People v. Burnett, 407 Ill. 269; People v. Piszczek, 404 Ill. 465.) The right of a defendant to conduct his defense without the assistance of counsel has been recognized in this and other jurisdictions. People v. Corrie, 387 Ill. 587; Ann., 17 A.L.R. 266.

The record in this case exemplifies that a defendant, who either cannot or will not accept the responsibility of conducting his own defense, can so hinder the ordinary functioning of the judicial process as to render difficult any rational disposition of his case. Our adjudicative procedure is dependent, to a large extent, upon the understanding and co-operation between court and counsel, which existed to a high and commendable degree throughout the trial of this case. However, even this rapport could not withstand the onslaught of the defendant's conduct in his own defense. If insane at the time, he should not have been tried on the charge of murder. The sanity issue was properly before the court and its determination was the keystone to the court's rulings on the defendant's rejection of counsel and request to conduct his own defense. If then sane, the defendant, upon the waiver of counsel, had the right to defend himself, subject to the constant duty of the court to protect the judicial process from deterioration occasioned by improper or inadequate conduct of the defense. In such situation the court possesses broad discretion in relation to the appointment of counsel for advisory or other limited purposes, or to supersede the defendant in the conduct of the defense. Continuous supervision of the trial is required in order to maintain proper judicial decorum, to the end that defendant may receive a fair trial. Cf. *People* v. *DeSimone,* 9 Ill.2d 522, at 533.

People's exhibits 1 and 2, pictures of the deceased in the nude, lying on a bloody and disheveled bed, are suggestive of rape, were prejudicial, and should not have been admitted in evidence. The hearsay evidence complained of was objectionable, and its admission was error, as was the evidence tending to suggest that defendant had been previously arrested. The chief of police testified to material statements made by the defendant at the time of his arrest, and it was error thereafter to admit in evidence the repetitive unsigned written statement.

In view of this conclusion, it is unnecessary to pass upon the contention that the verdict is not sustained by the evidence.

The judgment of the circuit court of Kane County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*