**UNITED STATES of America,**
**Appellee,**

v.

**Hubert A. VAUGHAN, Defendant-**
**Appellant.**

**No. 301, Docket 34856.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 30, 1970.

Decided April 19, 1971.

Moore, Circuit Judge, dissented and filed opinion.

William E. Hellerstein, New York City (Milton Adler, the Legal Aid Society, New York City, of counsel), for defendant-appellant.

Asst. U. S. Atty., Rudolph W. Guiliani (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York and Jon A. Sale, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MOORE, FRIENDLY and ADAMS,* Circuit Judges.

ADAMS, Circuit Judge.

On April 28, 1969, four men robbed the Manufacturers Hanover Trust Company branch located at 748 Columbus Avenue, in Manhattan. Appellant Vaughan was eventually convicted after a non-jury trial before Judge John M. Cannella, in the United States District Court for the Southern District of New York, for violating, by his role in the robbery, 18 U.S.C. §§ 371, 2113(a) and 2113(d). Vaughan has never disputed his participation in the robbery, but rather has contended he was not sane at the time, because he had taken STP (a drug related to LSD) the evening before.

The principal issue in this appeal is whether Vaughan's right to a fair trial and his waiver of a jury were impaired by the trial court's continuous reference

---

* United States Circuit Judge of the Court of Appeals for the Third Circuit sitting by designation.

to, and apparent reliance upon, a letter written to the court by Vaughan immediately prior to trial, not introduced as evidence in the case, and which at the beginning of the trial the court said it would disregard.

Vaughan's letter to the district court in part contained an offer to plead guilty to the conspiracy count on the understanding the trial judge would place Vaughan in a rehabilitation center operated by a court-appointed psychiatrist who had examined Vaughan.[1] The district court explained to Vaughan on the day of the trial that it could not accept a plea because of the question of Vaughan's responsibility for his actions. That is, under the circumstances, the Court did not wish to take the responsibility of accepting a guilty plea, but thought it more appropriate to consider all the testimony regarding Vaughan's sanity at the time of the robbery. In assessing the voluntariness of Vaughan's jury trial waiver, the court indicated that the letter would have no role in his ultimate decision:

> " * * * I will make every effort that I can to forget everything that is in this letter because when I try the case I can only decide the case on what appears in the evidence in the case, the exhibits and anything that happens during the trial, and I will not be able to render any decision based on any of the facts that you recite in your letter * * *"

Vaughan thereupon affirmed his election to waive a jury.

During the trial, two psychiatrists were called by the defense to testify. Both were court-appointed, one selected by the defense, and one by the prosecution. Each testified at length concerning his diagnosis of Vaughan's mental condition at the time of the robbery (based on statements made by Vaughan, including the claim he had taken STP before the crime was committed), as well as his condition at the time of trial. In a pre-trial report, Dr. Ralph S. Banay, one of the psychiatrists, described Vaughan's conduct at the time of the crime to have been the product of an "abnormal and unrealistic state of mind." The other psychiatrist, Dr. Hugh F. Butts, found Vaughan to be "psychotic," at the time of the crime. He also found that "[a]s a result of mental disease the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

In the course of the testimony of Dr. Butts, the court frequently asked him questions to clarify and expand various points. These questions reflected the trial judge's deep concern and his careful weighing of the evidence. However, he asked Dr. Butts about the contents of the pre-trial letter written by Vaughan to him, using the letter, though it was not admitted into evidence, as an indication of Vaughan's mental condition. For example, the judge said to Dr. Butts:

> "What I want to ask you about is generally what that letter indicates. You see there is a bargaining feature to this letter. In other words, do these fellows that have these symptoms also become bargainers, they want to know if they do certain things, whether they can get something in return? In other words, he is offering to plead there to a conspiracy provided his conditions are met. This kind of bargaining, do they have this kind of a tendency, do they bargain with people in situations like this?"

<hr>

1. Vaughan's letter, stated:
   "I ask 'you' now for this plea of conspiracy with the understanding that I will not be returned to the animal environment of prison but placed in the care of Dr. Benet's [sic] Rehabilitation Center, where I can try to reorganize my life to cope with the existing realities. I ask you this in ernest [sic] and I hope you will be responsive to this plea."
   "Dr. Benet asked me, 'What will you say to the judge'? Well your honor I have said it. I don't want to beat a case. I want help, if justice or its purveyor can be responsive to another person. *Please Help Me.*"

The court later handed Dr. Butts the letter from Vaughan, and the following colloquy then took place:

"The Court: It is the same kind of thing you elicited from him. The only reason I put it in is that it seems to me it covers a lot of the same ground that you covered and I got exactly the opposite view from it as you did.

The Witness: That strikes you as a very lucid letter.

The Court: Of course. Not only lucid, but the kind of a letter, with the education he has had, I don't know how he did this. That is why I asked him whether he actually wrote this letter himself or whether somebody wrote it for him and phrased it for him. I can't see how a fellow, if he has this psychotic condition that you are talking about, can put those thoughts together * * *."

After further testimony by Dr. Butts, the judge commented:

"I don't see that it serves any purpose in going over this letter with you. I have read the letter a number of times. As I indicated to you before, I felt that this letter speaks loudly as far as he is concerned, more so than almost anybody could speak for him or tell about him * * * There are many impressions I gain from this letter."

During Dr. Banay's testimony, the court again referred to Vaughan's letter as indicating the defendant's great confidence in Dr. Banay:

" * * * He wrote me a letter, for example, indicating that he was willing to plead to certain aspects of this case provided I place him in care of you and your rehabilitation center, where he would try to reorganize his life to cope with existing realities, and he wanted an opportunity to do that."

At the close of the trial, the court rejected the opinions of the expert witnesses that Vaughan's conduct at the time of the robbery was the product of a mental disease or defect, and found Vaughan guilty.

■ The Government contends that absent a showing of substantial prejudice, a court sitting without a jury is presumed to base its verdict only on proper evidence.[2] Assuming the applicability of such a presumption, it is rebutted in this case by the trial judge's repeated references to, and apparent reliance upon, a matter not in evidence. While we have no doubt that the court referred to the letter solely because of his conscientious desire to judge correctly this defendant, reliance on such extra-evidentiary matters is reversible error. Cf. United States v. Hamrick, 293 F.2d 468 (4th Cir. 1961). For a factual situation similar to the present case, see People v. Green, 21 Mich.App. 575, 175 N.W.2d 521 (1970).

The use of this letter as relating to defendant's mental condition may not be considered harmless when such condition was the central issue in the case. The fact that the judge made no reference to the letter in his findings of fact cannot be determinative when there are continual references by the court to the letter in the record itself.

■ The Government contends that the absence of any objection by Vaughan's counsel during the trial to the court's references to the letter bars the defendant from raising the point on appeal. However, it would have been difficult at any particular time during the trial for defense counsel to know he should object once the trial judge had said he would not consider the letter. Preferably, counsel should have objected once the court's reliance on the letter became apparent. Nonetheless, this error of the court may well have affected the integrity of the fact-finding process, and is therefore appropriate for appellate notice under Fed.R.Crim.P.

2. See United States v. Reeves, 348 F.2d 469 (2d Cir. 1965).; cf. United States v. Bowles, 428 F.2d 592 (2d Cir. 1970).

52(b).[3] As Professor Wright has stated, "It is not a miscarriage of justice to convict a guilty man, but if he is convicted in a way inconsistent with the fairness and integrity of judicial proceedings, then the courts should invoke the plain error rule in order to protect their own public reputation." [4]

■ Vaughan also urges that his conviction should be reversed because the government did not prove him to be sane at the time of the robbery. Vaughan's theory is that a trier of fact may not disregard psychiatric testimony when no contrary expert testimony has been presented. See Beltran v. United States, 302 F.2d 48 (1st Cir. 1962). The psychiatrists' testimony, however, was based on Vaughan's statements to them that he had taken STP at the time of the robbery. Vaughan did not testify at trial. We have closely examined the record in this case, including the trial court's findings of fact, and conclude that the court may not have accepted the factual predicate of the psychiatrists' opinions that Vaughan had taken the drug at the time of the robbery. While the record is not wholly clear on this point, there is sufficient ambiguity to prevent us from holding the court erred in finding that the government had met its burden. Cf. United States v. Carter, 436 F.2d 200 (D.C. Cir. 1970).

The judgment of the District Court will be reversed, and the case remanded for a new trial.

MOORE, Circuit Judge (dissenting):

On this appeal, defendant Vaughan, convicted after a full presentation of the facts of the crime of armed bank robbery (a crime in which he does not dispute his participation), asks this court to reverse and dismiss the indictment or in the alternative to grant him a new trial. He would willingly accept either result from the court so as to re-enter society where as he told one of his psychiatrists, being "convinced as to the justifiability of his crime" he "would do it again if he were released." The majority would not deprive him of this opportunity. What brings about such a seemingly bizarre result? Let us return to the time of trial.

Vaughan is about to be tried. The judge is Judge Cannella, a considerate and experienced judge. The date is November 13, 1969. The question is raised as to Vaughan's mental competence to stand trial. Two psychiatrists have submitted their reports, both over six months after the robbery: Dr. Butts (report dated October 31, 1969) and Dr. Banay (report dated November 3, 1969). Dr. Butts: "I see no reason why this prisoner cannot, because of his psychiatric state, stand trial. He is medically competent." Dr. Banay: "He is capable to assist completely his attorney for his defense." "The Court: The Court finds * * * the defendant is mentally competent to stand trial."

The next step: By longhand letter from Vaughan to Judge Cannella received by the judge on November 12, 1969, Vaughan, in effect, offered to plead to the conspiracy count, attaching, however, certain conditions thereto. It was a long autobiographical letter containing many facts relating to Vaughan's life, virtually from birth, which might be regarded as extenuating circumstances and material for a probation report. Judge Cannella addressed Vaughan: "Mr. Vaughan, I do not accept your offer. I will not take a plea from you in any form. Even if at this time you said to me that you want to plead guilty to both charges in this indictment, I would not accept the plea under the circumstances of this case. I think you are entitled to have a finding by a jury or some competent Court as to whether or not in fact you committed the crime and whether you were respon-

---

3. "Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

4. 3 Wright, Federal Practice and Procedure, Criminal § 856 (1969); United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936).

sible for your acts at that time. I will not proceed by way of a plea."

The next step: the trial. Vaughan's counsel to Judge Cannella: "he [Vaughan] tells me that he wishes to waive trial by jury and proceed with a trial by your Honor, and he is aware, of course, that your decision alone will be determinative if this waiver of jury trial is accepted." Judge Cannella was reluctant and again addressed Vaughan.

"Q. And you are making this request that the trial proceed without a jury and that it be tried by the Court alone? A. Yes, sir I am.

"Q. You realize that you have a right to have a jury picked and have the jury pass on your guilt or innocence, don't you? A. Yes."

Judge Cannella continued with his inquiry concerning matters contained in Vaughan's letter to make doubly sure that Vaughan was aware of the revelations therein, namely, use of various narcotics and drugs (including STP), his previous prison term, and his claim that because of taking STP he lacked the requisite intention to commit "a very serious offense here, bank robbery." The judge pointed out to Vaughan that this latter issue was "a very difficult issue for anybody to decide;" that it was "a decision which I will have to make sitting here alone;" and that "if you elected to do it, you could have twelve jurors make that decision instead of the Court." The judge then inquired as to Vaughan's opportunity to have discussed the facts with his counsel and verified an affirmative answer from counsel that Vaughan's decision was made "knowing full well what you are [he was] giving up, the rights you are [he was] giving up." After this colloquy, the final question was asked and answered:

"Q. Having heard all this, Mr. Vaughan, is it still your desire to have this case tried by the Court alone rather than by the Court and the jury? A. Yes, sir."

Only then did Judge Cannella proceed with the trial.

The majority must conclude that Judge Cannella, having received and read the letter the day before the trial commenced should have disqualified himself as a matter of law. The letter spoke only as of November 7, 1969. Vaughan was then competent to stand trial and competent to waive a jury. The disclosures which he chose to make concerning his rather unsavory past might have caused him to elect not to be tried by the judge to whom he made these disclosures. But fully aware of the facts and with advice of counsel, he made his decision.

Vaughan's letter was a diatribe against society because of his resented economic condition and his being black. It did not relate to Vaughan's participation in the bank robbery. In fact there is no indication that Judge Cannella so understood it because he specifically asked Dr. Butts as to the significance of the "bargaining feature" of the letter which only could have been created when the letter was written. If Vaughan were psychotic and the "bargaining feature" indicative thereof, this situation could only have affected his ability understandingly to waive a jury trial. No issue, however, of his competence in this respect is raised.

The function of an appellate court is to decide whether the judgment of conviction was based upon reversible errors. It definitely is not, and should not be, our task to evaluate the credibility of the witnesses who appeared before the trial judge. His responsibility was no different from that of a jury which he would have instructed that they could accept or reject all or part of any witness' testimony. He would have added that merely because the testimony came from psychiatrists the principle governing credibility remained the same.

The majority opinion would lead the reader to believe that the case as tried centered around and featured Vaughan's pretrial letter to Judge Cannella and the

testimony of two psychiatrists. Nothing could be further from the facts. Vaughan was convicted of bank robbery in which he admitted his participation. Furthermore it must be kept in mind that the psychiatrists knew nothing of Vaughan's mental condition at the time of the robbery except as he (Vaughan) gave them his version some six months later. Their expert psychiatric opinions were based largely on the assumption that anyone who tries to rob a bank and bungles the job, of necessity, must be mentally unbalanced, insane or without knowledge of what he was doing.

In fairness to Judge Cannella it might not be inappropriate to state the facts upon which he based his judgment of conviction.

On Sunday, April 27, 1969, about noon Vaughan invited Fernandez, a co-conspirator, to drive downtown from the Bronx. En route they discussed robbing a bank and looked with favor on selecting the Manufacturers Hanover Trust Company branch on Columbus Avenue between 91st and 92nd Streets. Vaughan by telephone to Fernandez later that evening confirmed the robbery which was to take place the next day. There is no suggestion, not even by the psychiatrists, that Vaughan was mentally unbalanced or insane when he made these plans.

The next morning Vaughan and two of his confederates, each with guns, entered the bank. To get behind the counter, Vaughan leaped over it and started to fill one of two pillow cases with the bank's money. Apparently anxious to make his get-away and unable to open the gate (operable by pressing a button), Vaughan again vaulted over the counter and with the other robbers ran out of the bank. Seeing a police car nearby Vaughan threw the pillow case into the get-away car and escaped on foot. Somehow, somewhere and at some time during his activities, Vaughan had dropped the keys to the get-away car.

The psychiatrists say that to drop car keys under the circumstances is obviously a sign of a disturbed mind and particularly so while the police were descending on them, not to return to the bank to look for them.

The two tellers, forced to surrender the money, the Assistant Manager, the Operations Supervisor and the Branch Manager all testified as to the robbery. In fact there is no doubt as to Vaughan's participation therein. Nor, except for his own out-of-court statements to the psychiatrists—long after the robbery —that he had taken STP the night before the robbery, was there any evidence thereof.[1] Vaughan's own grand jury testimony made no mention of it.

Just as jury findings when supported by evidence should be binding, so also should the findings of the trial judge. Judge Cannella's findings of fact and conclusions are based upon the proof submitted as to the robbery and contain no reference to the Vaughan letter—as certain an indication that he adhered to his statement that he would disregard it as that of any trial judge in a non-jury case who has to read papers and documents to pass on their admissibility and then excludes them.

This trial judge with a long and distinguished background in State and Federal courts in the light of the extremes to which these two psychiatrists carried their hypotheses and speculations as to factual situations about which they knew nothing was entitled to find "the testimony to be unpersuasive;" "that the facts upon which they testified have not been proven to the Court's satisfaction * * *;" that "at most the experts' testimony is advisory and not conclusory;" and that he would not "accept it [their testimony] insofar as the conclusion is reached by them that his [Vaughan's] conduct at the bank at the time of the commission of the crime was the product of a mental

---

1. As found by the trial judge "almost entirely their [the psychiatrists'] testimony was based upon the subjective statements made to them by the defendant * * *."

disease or a mental defect or intoxication or psychosis, * * *." [2]

Judge Cannella properly exercised his function as "the" juror in the case. Charged with weighing the facts and the credibility of witnesses, the judge could not possibly have accepted the psychiatrists' testimony as disclosed by the record.

I would affirm the conviction.

2. A moment's thought as to Vaughan's actual conduct as distinguished from the psychiatric gloss which the psychiatrists spread over it suffices to justify Judge Cannella's conclusions. Vaughan knew what he was doing on Sunday when he planned the robbery. He was able to drive downtown and pick the victim bank. The next morning he was able to remember its location. He was perceptive enough of the possibilities of apprehension to leave the bank after the first entry because of the presence of police officers in the area. After their departure he then re-entered the bank. Instead of inquiring about the system of gates and their locks, he used the more direct approach to the money by vaulting over the counter and the same method for his exit when a confederate warned him of danger by calling "let's go." Every move was that of a man in full possession of his faculties. Vaughan didn't have time for the luxury of hallucinations; he was too busy. The hallucinations were added by the psychiatrists some six months later. No wonder Judge Canella rejected their testimony *in toto*.