(No. 50240.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. RICHARD GREEN, Appellee.

*Opinion filed January 26, 1979.*

RYAN, J., specially concurring.

William J. Scott, Attorney General, of Springfield, and Edward Petka, State's Attorney, of Joliet (Donald B. Mackay, Melbourne A. Noel, Jr., and David Barkhausen, Assistant Attorneys General, of Chicago, and Robert P. Livas, Assistant State's Attorney, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Mark W. Burkhalter, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

In a jury trial in the circuit court of Will County defendant, Richard Green, was convicted of burglary and

sentenced to the penitentiary for a term of not less than 5 nor more than 15 years. The appellate court reversed and remanded (53 Ill. App. 3d 820), and we allowed the People's petition for leave to appeal. In reversing, the appellate court held that under *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the People's cross-examination of defendant concerning his post-arrest silence and certain comments made by the assistant State's Attorney during final argument deprived defendant of due process. The People contend that because defendant had failed to object either to the cross-examination or the allegedly improper argument, the error, if any, was waived, and that plain error should not be recognized where, as here, the evidence of guilt was overwhelming and the error harmless beyond a reasonable doubt. The People contend, too, that the cross-examination was not error for the reason that the matter was first brought out in plaintiff's direct testimony; that what occurred was not cross-examination concerning defendant's post-arrest silence, but was in fact cross-examination concerning post-arrest statements inconsistent with defendant's testimony at trial; and, finally, that the rule in *Doyle v. Ohio* should not be applied retroactively to a case tried 18 months prior to the date of the *Doyle* decision.

Defendant and Jessie Couch were indicted for the burglary of a house in Joliet. The owner had recently died and the house was unoccupied. A neighbor who saw two men pry open a window and enter the house phoned the police, who, upon arrival, found defendant hiding under a boat in the garage and Couch hiding in a bedroom closet. Two watches, a ring, a pocket knife and a screwdriver were found in the closet, near Couch. There was an open dresser drawer in the bedroom where Couch was found, and a jewelry box inside the drawer was also open. The executor of the deceased owner's estate was unable to testify that anything was missing from the jewelry box since no

inventory had been made of the property in the house.

Defendant and Couch were arrested and advised of their rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Police officer Allan Horvath testified that he and his partner, Officer Fitzgerald, received a radio dispatch that there was a burglary in progress and that, upon arrival at the house, he entered the garage. He saw defendant lying underneath a boat. After advising defendant of his constitutional rights he asked him if there was anyone else inside the house, to which defendant replied that there was one other man. He then asked defendant "if there was a car involved," to which defendant replied "No." Defendant was asked if the other man had a gun and defendant replied "No." Defendant said nothing further until reaching the police station, where he asked to see Sergeant Hernandez.

On direct examination defendant testified that he, his wife and children had been locked out of their motel and that, after being unable to locate another place to stay, he entered the house to explore the possibility that he and his family might spend the night there. On cross-examination the following occurred:

"Q. Mr. Green, when the police took you to the car, to the squad car, did you tell them from the time you left the house until the time you went to the squad car why you went into the house?

A. When I got down to the station they told me—

Q. That's not the question I ask you, Sir—Did you tell the police?

A. Why I went into the house?

Q. Yes, Sir.

A. Tell like why I was there?

Q. Yes.

A. No Sir.

Q. Did you say anything to them in the squad car at all?

A. Just when he was reading me, reading my rights.

Q. You didn't talk to them when you were in the

squad car? Did you talk to the police officer?

A. When I was in the squad car the only thing I asked—they asked me if I understand my rights and I told him yes. That's all I said in the squad car. That's all he asked me and then he told me to shut up.

MR. LECHWAR: I have no further questions, your Honor."

The transcript reflects the following during defendant's redirect testimony:

"Q. Did you talk to the police at the police station?

A. Yes, I did.

Q. Did you tell them why you had broken into the house?

A. I had at the police—Sgt. Hernandez?

Q. Yes.

A. I asked if I could talk to Sgt. Hernandez and they told me I was and I didn't see him down here, and I told them they never send him.

MR. MURER: I have no further questions."

During re-cross-examination the following ensued:

"Q. When you were at the police station, Mr. Green, and you asked to see Sgt. Hernandez, did you tell anyone then that you had—this is the reasons—the reason why you went into the house, did you give anybody the reason why you went into the house?

A. No, that's why I asked to see Sgt. Hernandez.

Q. But you didn't tell anybody else, the police down there?

A. No, they didn't ask me.

Q. You didn't tell Sgt. Hernandez?

A. I never seen him, they never send him down to me."

During final argument the assistant State's Attorney said:

"And that brings up another interesting point, ladies and gentlemen. If they went in there as they said to find a place to live for someone, why didn't they say anything? Both of them answered some questions. Mr. Green was read his rights, and he answered the question that the police officers read him off the card and then he said we didn't have a car, we didn't have guns, and that the only

"other person with me was the guy in the house. He never said anything at all about why they went into the house. They don't try to defend themself [*sic*]. He rode to the station in their police car with the policeman there, they never said anything then."

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the Supreme Court, after pointing out that the warnings mandated by *Miranda* require that a person taken into custody be advised of his right to remain silent, that anything that he said might be used against him, and that he had a right to counsel before submitting to interrogation, said, "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale* [(1975), 422 U.S. 171, 177, 45 L. Ed. 2d 99, 105, 95 S. Ct. 2133, 2137]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle v. Ohio* (1976), 426 U.S. 610, 617-18, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-45.) In *People v. Rehbein* (1978), 74 Ill. 2d 435, this court, after discussing *Miranda, United States v. Hale,* and *Doyle,* stated that in *Doyle* the Supreme Court "barred a State prosecutor's reference to a defendant's silence even for impeachment. Basing its reasoning on the fourteenth amendment's due process guidelines, rather than merely on the fifth amendment's privilege against self-incrimination, the court said that *Miranda* gives implicit assurance that silence will not be used against the defendant. Post-arrest silence is insolubly ambiguous. *Doyle* thus goes beyond the evidentiary test of *Hale* and establishes a *per se* constitu-

tional bar to the use of silence." (74 Ill. 2d 435, 440.) In *People v. Hamby* (1965), 32 Ill. 2d 291, 294, the court, in considering waiver and plain error, said, "We consider the waiver principle a salutary one, conducive to the effective enforcement of the rules which society has established for its protection, but we have not hesitated to relax its application where fundamental fairness so requires." (32 Ill. 2d 291, 294.) In our opinion fundamental fairness requires that the matters of which defendant complains be recognized as plain error.

We consider next the People's contention that the assistant State's Attorney did not err in cross-examining the defendant concerning his post-arrest conversation with the police or in thereafter commenting on it in closing argument. They argue that this was permissible because there was "a threshold inconsistency" between defendant's post-arrest statements and his subsequent exculpatory testimony. They contend that his post-arrest denial that he had gone to the house where he was arrested in a car was inconsistent with his exculpatory story at trial that he had been driving around all day in search of a place for his family to stay. This, they argue, made it proper for the State's Attorney to ask defendant if he had made other statements to the police. The record shows that Officer Horvath testified that in response to his questions as to "whether there was a car involved" defendant replied "No," that co-defendant Couch's wife testified that she waited in an automobile which was parked one-half block away from the house and defendant testified that he was asked by the police officer whether he had come by car, to which he replied in the affirmative. He stated that he was then asked by the police officer where the car was and replied that it was parked down the street. There was no cross-examination concerning this inconsistency or any attempt to offer impeaching testimony. There was nothing about the inconsistency which would permit the cross-

examination of defendant concerning his alleged failure to advise the police of his exculpatory story and nothing in either the testimony or argument which would justify the further exacerbation of the error by the comment made by the assistant State's Attorney during final argument. The situation here is clearly distinguishable from that in *People v. Rehbein* (1978), 74 Ill. 2d 435. In *Rehbein* the defendant testified to an exculpatory story and was impeached by testimony that he had made inconsistent statements to police officers concerning the description of his automobile and whether it was driven on the night of the occurrence. He also "denied any knowledge of being involved in any type of situation." (74 Ill. 2d 435, 438.) Here, had the People proved the inconsistence by proper impeachment, it would not have served to impeach in any manner whatsoever the exculpatory testimony at trial.

We consider next the People's contention that the rule of *Doyle* should not be applied retroactively. Decisions of this court have consistently held that evidence of silence upon advice of counsel was inadmissible. (*People v. Pfanschmidt* (1914), 262 Ill. 411, 448-50; *People v. Blumenfeld* (1928), 330 Ill. 474, 491-92; *People v. Rothe* (1934), 358 Ill. 52, 57; *People v. Lewerenz* (1962), 24 Ill. 2d 295, 299.) Although the Supreme Court has not decided the question whether *Doyle* is applicable to cases tried prior to the date of its decision, it has vacated a judgment and remanded the cause for further consideration in the light of *Doyle*. (See *Lebowitz v. Florida* (1976), 429 U.S. 808, 50 L. Ed. 2d 68, 97 S. Ct. 44.) We do not, however, find it necessary to decide the question here.

The People contend that the error, if any, was harmless. In *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287, the court said:

"Before a Federal constitutional error can be held harmless, the court must be satisfied beyond a reasonable doubt that the error did not contri-

bute to the defendant's conviction. (*Harrington v. California,* 395 U.S. 250, 251, 23 L. Ed. 2d 284, 286, 89 S. Ct. 1726, 1727; *Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828.) ' "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." ' *Chapman v. California,* 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827; see also *Schneble v. Florida,* 405 U.S. 427, 432, 31 L. Ed. 2d 340, 345, 92 S. Ct. 1056, 1060."

The testimony leaves no doubt that defendant and Couch "jimmied" the window and entered the house, where defendant was found hiding under a boat in the garage and Couch in a closet. The only defense to the charge of burglary was that defendant lacked the intent to commit a theft (Ill. Rev. Stat. 1973, ch. 38, par. 19—1); rather, defendant claims, he entered the house with the intent to find shelter for the members of his family, who had been locked out of their motel for failure to pay rent.

The manager of the motel where defendant and his family had been staying testified that defendant had not been locked out of the motel and had in fact paid his rent the morning of the break-in. She produced motel records as proof of this payment. The executor of the estate of the deceased owner of the house testified that he had checked every room in the house two days before the break-in and found everything in order and when he examined the bureau drawers in the bedroom after the break-in, they looked as though they had been "rifled through." The officer who entered the bedroom noticed that the top bureau drawer was open and that a jewelry box in the drawer had been opened and appeared to have pry marks on it. When Couch was discovered hiding in the bedroom closet, the police found him in possession of 21 pennies,

including an 1881 Indian head penny, in addition to the watches, ring, pocket knife and screwdriver mentioned earlier. The executor testified that the deceased owner of the house had been a coin collector.

We conclude that in view of the evidence of a theft in progress and the testimony of the motel manager, defendant's exculpatory explanation of his conduct was so thoroughly discredited that any prosecutorial reference to his failure to give the explanation earlier was harmless beyond a reasonable doubt.

For the reasons stated, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE RYAN, specially concurring:

Although I concur in the result reached in this case, I do not agree with the reasoning of the opinion. I would hold that by failing to raise the alleged constitutional error in the trial court the right to raise it on review has been forfeited. For the reasons stated below, the error would not constitute plain error and any discussion of harmless error is unnecessary.

We are dealing here with error that has been waived by not properly calling it to the attention of the trial court and preserving it for review. Were it not for the plain error exception to the waiver rule, the unobjected-to trial error would not be before this court. Therefore, in considering whether the unobjected-to trial error falls within the exception to the waiver rule, it is not necessary to determine that the error was harmless beyond a reasonable doubt even though the error may have been of constitutional dimension. Although usually referred to as "waiver," failure to object to trial errors more appropriately could be termed a procedural default. In any

event, when the trial error has not been properly pre-
served, we do not evaluate it in the usual sense, but we
determine whether the right to raise the error on review,
constitutional error as well as other trial error (*People v.
Pickett* (1973), 54 Ill. 2d 280), has been waived or
forfeited. It is not necessary to apply the harmless-error or
harmless-error-beyond-a-reasonable-doubt test.

There are two facets of plain error, both of which
require a reviewing court to consider a trial error even in
the absence of an attempt by the defendant to bring it to
the attention of the trial court. First, a significant purpose
of the plain error rule is to afford certain protections to
the defendant. If a serious injustice has been done to a
defendant, it should be corrected. To this end the strength
or the weakness of the evidence against him is relevant. (3
C. Wright, Federal Practice and Procedure: Criminal sec.
856, at 374 (1969).) Thus this court has held that in a
criminal case *where the evidence is closely balanced* a
court of review may consider errors that have not been
properly preserved for review. (*People v. Pickett* (1973),
54 Ill. 2d 280; *People v. Bradley* (1964), 30 Ill. 2d 597;
*People v. Nowak* (1939), 372 Ill. 381.) When the evidence
is closely balanced, there is the possibility that an innocent
person may have been convicted because of some error
which is obvious in the record, but which was not properly
preserved for review. In order to prevent such a serious
miscarriage of justice, a court of review may consider the
error. However, in doing so the court will look at the
record only to see if the evidence is "closely balanced." If
it is not, the reason for considering the error in the absence
of its preservation is not present. There is no need to apply
the harmless error test or, if the error involves a constitu-
tional right (*Chapman v. California* (1967), 386 U.S. 18,
17 L. Ed. 2d 705, 87 S. Ct. 824), the harmless-beyond-a-
reasonable-doubt test.

The other facet of plain error concerns the protection

and preservation of the integrity and reputation of the judicial process. (3 C. Wright, Federal Practice and Procedure: Criminal sec. 856, at 374 (1969).) In considering this aspect of plain error, it is questioned whether the harmless error doctrine has any relevance, even harmless error beyond a reasonable doubt. In *Screws v. United States* (1945), 325 U.S. 91, 89 L. Ed. 1495, 65 S. Ct. 1031, Mr. Justice Douglas stated:

> "And where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion. Even those guilty of the most heinous offenses are entitled to a fair trial. *Whatever the degree of guilt,* those charged with a federal crime are entitled to be tried by the standards of guilt which Congress has prescribed." (Emphasis added.) 325 U.S. 91, 107, 89 L. Ed. 1495, 1506, 65 S. Ct. 1031, 1038.

Professor Wright states:

> "It is not a miscarriage of justice to convict a guilty man, but if he is convicted in a way inconsistent with the fairness and integrity of judicial proceedings, then the courts should invoke the plain error rule in order to protect their own public reputation." 3 C. Wright, Federal Practice and Procedure: Criminal sec. 856, at 374 (1969).

In considering this aspect of plain error, it has been held that the rule should be invoked only in exceptional circumstances to preserve the integrity and reputation of the judicial process. (*United States v. Musquiz* (5th Cir. 1971), 445 F.2d 963; *United States v. Vaughan* (2d Cir. 1971), 443 F.2d 92; *Davis v. United States* (9th Cir. 1970), 425 F.2d 673; *Marshall v. United States* (9th Cir. 1969), 409 F.2d 925.) It is in this context that we must view the previous statements of this court concerning plain error. In *People v. Pickett* (1973), 54 Ill. 2d 280, 283, this

court quoted from *People v. Burson* (1957), 11 Ill. 2d 360, 370, stating:

" 'The court may \*\*\* take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved \*\*\*.' "

The case of *People v. Burson,* from which this language was taken, is illustrative of the nature of the error which should be considered under the plain error rule as "depriving the accused of substantial means of enjoying a fair and impartial trial." In *Burson* this court found that the record raised serious doubts as to the defendant's sanity and that the defendant's counsel had suggested the defendant's insanity at the time of trial. This court stated that the trial and sentencing of an individual charged with a criminal offense while insane is a violation of due process of law. Therefore, although the question had not been properly preserved and argued, the court did not permit the waiver rule to operate to deprive the accused of his constitutional right to due process. The court then stated the language quoted above. It is also in this light that we must interpret the language of our Rule 615(a) (58 Ill. 2d R. 615(a)), which provides that "[p]lain errors or defects affecting *substantial* rights may be noticed although they were not brought to the attention of the trial court." (Emphasis added.) Thus I believe that under this second aspect of the plain error rule, the errors that will be considered as not having been waived, although not properly preserved, are those that are so fundamental to the integrity of the judicial process that they cannot be waived or forfeited by the failure to raise them in the trial court. I also believe that, being so fundamental to the integrity of the judicial process, they must be considered by the court regardless of the guilt of the defendant and therefore the harmless error test, even harmless error

beyond a reasonable doubt, is not relevant.

In this case, although the error complained of involves a constitutional right, it is not of such a fundamental nature that the plain error rule must be invoked to preserve the integrity and reputation of the judicial process. Also, as the majority opinion indicates by applying the harmless error rule, the evidence is not closely balanced. Therefore, it is not necessary for the error to be considered as plain error in order to prevent a miscarriage of justice. For these reasons I concur in the result reached by the majority; however, I consider the question of harmless error to be irrelevant.