THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD MORRIS et al., Defendants-Appellants.

First District (5th Division)   No. 78-1107

Opinion filed November 16, 1979.—Rehearing denied January 4, 1980.

320

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Lee Hugh Goodman, and Rimas Cernius, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendants Ronald Morris, Willie Pridgett and Arthur Jones were each found guilty of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and were each sentenced to a term of from four to six years' imprisonment. On appeal they raise the following issues: (1) they were not proved guilty beyond a reasonable doubt; and (2) the State's use of their post-arrest silence as impeachment deprived them of due process at law. In addition, Jones and Pridgett contend their sixth amendment right to confront witnesses against them was violated. Morris contends that (1) the State's eliciting his use of an assumed name was prejudicial error; (2) the State's cross-examination of him insinuating, without proof, that he confessed to this crime was prejudicial error; and (3) that the State's eliciting testimony allegedly occurring during plea negotiations was prejudicial error.

The following pertinent evidence was adduced at trial.

*For the State*
*Dick Cozad, Ford City Police Officer*
On March 23, 1976, he and his partner, Craig Carney, were patrolling the parking lot of the Ford City Shopping Center (Ford City). At about 5:15 p.m., they received a radio communication from Ford City police officer Brad Williams of roof patrol. Williams directed them to an area of the parking lot where they observed a white Oldsmobile containing four

black men. Within an hour, they received a second communication from Williams informing them of an armed robbery taking place in a 1973 Cadillac. He pulled their unmarked car in front of the Cadillac. Inside the Cadillac were Flora Collins, her brother Clayton Collins, and defendants Morris, Pridgett, and Jones. Flora Collins got out of the car on the passenger side and told Officer Carney that she was being robbed. Carney relayed the information to him, and he then ordered Jones to get out from behind the wheel. While he was handcuffing Jones, Carney removed Morris and Pridgett from the back seat. Chicago police officers Toomey and O'Connor arrived at this time. Cozad searched the car and found money and postage stamps on the floor of the back seat. Carney turned over to Officer Toomey a knife found at the scene.

On cross-examination, he stated he was parked about a half-block away from the white Oldsmobile for 45 minutes before receiving the radio communication of an armed robbery in progress. Officer Carney's conversation with Flora Collins on the passenger side of the car was outside of his hearing. He did not hear Flora Collins scream when she got out of the car.

*Flora Collins*

On March 23, 1976, she went to Ford City with her seven-year-old brother Clayton. After completing her shopping, she left the Wieboldt's department store and walked toward her car in the parking lot. Defendants were standing by her car and, as she approached, Morris walked to the front of the car and the other two moved to the back. Clayton was walking to the passenger side when Morris grabbed him. When Morris held a knife to Clayton's throat, Clayton screamed. At the same moment, Jones pushed her into the passenger side of the front seat and when Jones threatened Clayton, she told her brother to stop screaming. Morris and Pridgett sat in the back seat of her car with Clayton between them. After everyone was inside the car, Jones tried to start the car, but was unable to do so without her help. She told them they could have her car, keys, and money, if they would let her and her brother go. When Pridgett demanded her wallet, she threw her red coin purse into the back seat. The purse contained $24 and some postage stamps. At that moment, a car pulled in front of hers, and Morris said: "Look out. Here comes the police." A police officer came to her window, and she stepped out of the car. Holding a shopping bag to the side of her face, she whispered to the officer that she was being robbed. The officer, apparently not hearing what she said, asked for her license. She said her brother had it and then asked Morris if her brother could get out of the car. When Clayton got out of the car, she yelled, "I'm being robbed."

On cross-examination, she stated it was daylight and the parking lot lights were off when she left Wieboldt's. The doors to her car were

locked, but she opened them as her brother walked to the passenger side. She put the keys into the ignition on her own initiative. They were inside the car about four or five minutes when the police arrived. While inside the car, she lighted a cigarette. She testified that the defendants were strangers and that she never saw the knife held by Morris after entering the car. On redirect, she explained that because she felt the defendants were going to take her car, she put the keys in the ignition.

*James Andrew O'Malley*

At approximately 6 p.m. on March 23, 1976, he was in the Ford City parking lot on his way to a bowling alley. After parking his car, he saw Morris, Jones, and Pridgett walking in the parking lot. He then went into the bowling alley to change clothes and, five minutes later, returned to his car with his clothes. Walking back to the bowling alley he heard screams; he turned and saw the defendants forcing two people into a car. He began to walk toward the scene when he saw a Chicago police car and another car moving toward this car. When he reached the scene, he saw defendants being taken from the car.

On cross-examination, he stated the parking lot lights were off and it was dusk when these events occurred. He saw the faces of the defendants for about 30 seconds before going into the bowling alley. Although he stated two of the defendants were on one side of the car and one on the other, he could not remember the exact position of each defendant. The Chicago police car was the second car at the scene and arrived approximately three to five minutes after he heard the screams.

*Edward Toomey, Chicago Police Officer*

On March 23, 1976, he and his partner James O'Connor were patrolling the Ford City parking lot. They received a radio communication from Ford City police officer Brad Williams of an armed robbery in progress. They proceeded to the Wieboldt's parking lot where they encountered Ford City officers Cozad and Carney taking defendants into custody. Cozad and Carney turned over a knife, $24, and postage stamps found at the scene. On cross-examination, he stated it took them approximately three to four seconds to reach the scene after they received the radio communication. At the scene, he noticed Officer Carney had a red coin purse in his possession, but it was not turned over to him.

*Brad Williams, Ford City Police Officer*

On March 23, 1976, he was working roof patrol in the shopping center. Using a pair of binoculars, he observed a suspicious group of men and relayed this information to Officers Carney and Cozad. These men were the defendants. He later observed the defendants standing by a 1973 white Cadillac. As Clayton Collins approached the passenger side of this car Morris stopped him; held a knife to his throat; and forced him into the

back seat. At the same time, Jones, on the driver's side of the car, pushed Flora Collins into the front seat of the car. Pridgett, also on the driver's side, got into the back seat of the car. After seeing this, he told Officers Carey and Cozad what happened and directed them to the scene. Shortly after Cozad and Carney arrived at the scene, Chicago police officers Toomey and O'Connor arrived.

On cross-examination, he explained that his observation position was approximately 50 feet from the scene and the parking lot lights were off at the time. He heard Clayton Collins scream at the time of the incident. He estimated that Officers Carney and Cozad arrived at the scene 10 seconds after Flora and Clayton were forced into the car.

### For the Defendants
#### Ronald Morris on his own behalf

Prior to March 23, 1976, he knew Flora Collins and had purchased marijuana from her on three or four occasions at the gas station where he worked. On March 23, Dwayne Mitchell drove him to Ford City where he met Flora Collins. She offered to sell him $10 of Columbian marijuana, and he agreed. He paid her the $10 and she told him she would deliver the marijuana in 30 minutes at the gas station where he worked.

He then went into a bowling alley and met Pridgett and Jones. Since Mitchell had left him at Ford City, he asked them for a ride home, and they agreed. He told them he was buying some Columbian marijuana.

With Pridgett and Jones, he went out to the parking lot and waited for Flora at her car. Flora returned to the car, and they sat inside her car. He did not hold a knife to the throat of Clayton Collins or force him into the car. Flora lighted a joint of marijuana which everyone smoked. Jones was in the driver's seat because Flora said she couldn't drive and smoke marijuana at the same time. After smoking the marijuana, he told Flora it was not Columbian and asked for his money. She said she didn't have it. At that moment, the police arrived.

On cross-examination, he stated Flora met them at her car approximately three minutes after they left the bowling alley. When they got into the car, Clayton did not scream. He never saw Flora Collins' little red purse. They were in the car approximately five minutes before the police arrived. He denied telling any police investigators at the police station that he held a knife to Clayton's throat or that he robbed Flora. He also denied telling a probation officer that he, Jones, Pridgett, and a Johnny McCrae were at Ford City to rob Flora Collins.

#### Willie Pridgett on his own behalf

At about 4:45 p.m. on March 23, 1976, he, Arthur Jones and Johnny McCrae drove to Ford City. At a bowling alley in Ford City he met a man

known to him as Andre Swift. Andre Swift is also known as Ronald Morris. He, Jones, and Morris left the bowling alley and walked to a car in the parking lot where Morris was to buy marijuana. They met Flora Collins and her brother at the car, and everyone got into the car. Jones and Flora were in the front seat and Morris, he and Clayton were in the back seat. Neither Flora nor Clayton was forced into the car. Clayton did not scream when they got into the car. Once inside the car, Flora started the car because Jones, seated at the wheel, was unable to do so. They smoked a joint of marijuana which Flora had lighted. When the police arrived, they took $27 from him. He told the police that he was buying marijuana.

On cross-examination, he denied telling a probation officer that he was involved in an armed robbery of Flora Collins.

*Arthur Jones on his own behalf*

On March 23, 1976, he, Pridgett and Johnny McCrae went to a bowling alley in Ford City where he met Andre Swift. Swift is also known as Ronald Morris. Morris told him and Jones of a woman from whom he was going to purchase Columbian marijuana. He, Morris, and Pridgett went to Flora Collins' car to purchase marijuana. When Flora and her brother came back to the car, everyone got inside the car. No one forced either Flora or Clayton into the car. Clayton did not scream when they got into the car. Flora lighted a joint of marijuana, and everyone smoked it. Morris complained that the joint was not the Columbian marijuana they had agreed upon. At about that moment, the police arrived and they were placed under arrest. No one robbed Flora Collins or held a knife on Clayton.

On cross-examination, he stated Morris had the joint when the police arrived, but he didn't see what happened to it.

*For the State—Rebuttal*

*Ruth Hazle*

She is a probation officer. She conducted a pretrial investigation of Morris and discovered his real name to be Andre Swift. According to her report, Morris told her that he, McCrae, Pridgett and Jones were going to rob Flora Collins. Morris did not tell her he was in Flora Collins' car solely to purchase marijuana.

*James O'Connor, Chicago Police Officer*

When he and his partner reached Flora Collins' car, he did not detect the smell of marijuana inside the car. Ford City officers Carney and Cozad turned over a knife, $24, and postage stamps which were found at the scene to Officer Toomey. He also testified that none of the defendants told him a drug deal was being transacted when the police arrived.

*For the defendants—Surrebuttal*

Carol Swift, mother of Ronald Morris, and Alfreda Jones, wife of Arthur Jones, were present when probation officer Hazle interviewed Ronald Morris. They testified that Morris never told the probation officer that he robbed Flora Collins.

OPINION

The State contends that each of the issues raised by the defendants has been waived on appeal by the defendants' failure to make a written or oral post-trial motion for a new trial. Generally, failure to make a motion for a new trial constitutes a waiver of all errors that should have been raised in that motion. (*People v. Schoo* (1977), 55 Ill. App. 3d 163, 371 N.E.2d 86.) In a bench trial, however, a motion for a new trial is not necessary to preserve for review the question of whether the evidence was sufficient to find a defendant guilty beyond a reasonable doubt. (*People v. Larsen* (1977), 47 Ill. App. 3d 9, 361 N.E.2d 713, *aff'd* (1979), 74 Ill. 2d 348, 385 N.E.2d 679.) Consequently, we will review defendants' arguments that they were not proved guilty of armed robbery beyond a reasonable doubt.

■■ A court of review will not set aside a criminal conviction unless the evidence presented at trial is so improbable or so palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) The trial judge in a bench trial is to determine the credibility of the witnesses, the weight to be afforded their testimony, and resolve any conflicts in testimony. (*People v. Glaze* (1977), 48 Ill. App. 3d 523, 362 N.E.2d 1287.) Any discrepancies or conflicts in the testimony affect only the weight to be given the testimony, and the trier of fact is free to accept or reject as much or as little as it pleases of a witness' testimony. (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) Where the evidence is merely conflicting, a court of review will not disturb the judgment of the trier of fact. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

In the case at bar, the testimony of the victim established that on March 23, 1976, she and her brother Clayton were accosted by the defendants. Morris held a knife to Clayton's throat; Clayton screamed. At the same time, Flora was being forced into her car by Jones. Once inside the car, Pridgett, seated in the back seat, ordered Flora to give him her purse. She threw her red coin purse, which contained $24 and some postage stamps, into the back seat. At this time, the police arrived and arrested the defendants.

Flora Collins' testimony was corroborated on several points. First, the police found $24 and some postage stamps in the back seat of her car.

In addition, a knife was found either in the back seat or on the ground outside of the car. Second, Officer Williams saw Morris grab Clayton and hold a knife to his throat. Williams then heard Clayton scream in fear and watched Flora and Clayton being forced into the car. Third, James O'Malley heard the scream of Clayton and saw the defendants forcing two people into a car. Consequently, we find the evidence sufficient to establish defendants' guilt beyond all reasonable doubt.

Defendants have noted alleged inconsistencies in the testimony regarding the timing of these events and the relatively calm reaction of Flora Collins. As we have said above, inconsistencies and conflicts in the testimony affect the weight and credibility of the testimony. (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) In this case, the trial judge, who saw and heard the testimony, chose to believe the State's witness, and we will not overturn that decision on the basis of the cold record before us.

■■ Defendants also argue that the testimony of the defendants provided a believable exculpatory version of the events of March 23 and thus, creates a reasonable doubt as to defendants' guilt. We disagree. Defendants' version fails to account for Officer Williams' testimony that Morris held a knife to Clayton's throat; Clayton's scream in fear; and defendants forcing Flora and Clayton into the car. Similarly, defendants' story fails to explain James O'Malley's testimony that he heard screams coming from the car and that he saw defendants forcing two people into the car. The presence of a knife at the scene also belies the defendants' version. Thus, in light of the overwhelming and convincing testimony provided by the State, we believe the evidence was not so improbable or unreasonable as to raise a reasonable doubt of defendants' guilt. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.

■■ While the reasonable doubt argument of defendants was reviewable in the absence of a motion for a new trial (*People v. Larsen* (1977), 47 Ill. App. 3d 9, 361 N.E.2d 713, *aff'd* (1979), 74 Ill. 2d 348, 385 N.E.2d 679), the remaining issues are limited to review under the plain error rule (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)) because the defendants' failure to file a motion for a new trial. (*People v. Schoo* (1977), 55 Ill. App. 3d 163, 371 N.E.2d 86.) Under the plain error rule, a reviewing court may take notice of plain errors or defects affecting substantial rights of a defendant. (*People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.) With this limitation in mind, we turn to the remaining issues.

Pridgett and Jones maintain that their sixth amendment right to confront witnesses against them was violated. At trial, probation officer Hazle testified that Morris told her that he, Pridgett, Jones and McCrae were robbing Flora Collins when the police arrived. Defendants correctly point out that in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d

476, 88 S. Ct. 1620, the Supreme Court held that testimony by a witness of an out-of-court statement by a co-defendant implicating the defendant violates the defendant's right of cross-examination secured by the confrontation clause of the sixth amendment. We note that a violation of the *Bruton* holding constitutes plain error in Illinois. (*People v. Hopkins* (1970), 124 Ill. App. 2d 415, 259 N.E.2d 577.) In a later case, however, the Supreme Court limited the *Bruton* holding to cases where the declarant-defendant does not take the stand. (*Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723.) In *Nelson,* the co-defendant took the stand; denied making the statements implicating defendant; and testified favorably to the defendant concerning the underlying facts. The *Nelson* court reasoned that under these circumstances a defendant is denied neither the opportunity for cross-examination nor, in light of co-defendant's favorable testimony, the benefit of full and effective cross-examination. (*Nelson,* 402 U.S. 622, 629, 29 L. Ed. 2d 222, 228, 91 S. Ct. 1723, 1727.) The Illinois courts have followed the *Nelson* ruling in *People v. Brooks* (1972), 51 Ill. 2d 156, 281 N.E.2d 326, and *People v. Holtz* (1974), 19 Ill. App. 3d 781, 313 N.E.2d 234.

In the trial below, Morris took the stand; denied making the statements implicating Pridgett and Jones; and testified favorably to the defendants. Thus, Pridgett and Jones were not denied either the opportunity to cross-examine Morris or the benefit of full and effective cross-examination given the favorable testimony of Morris. Consequently, under the above authority, Pridgett and Jones were not denied their constitutional right to confront witnesses against them.

▪ All three defendants maintain that at various points in the trial they were denied due process of law because the State elicited testimony of their post-arrest silence to impeach their exculpatory trial testimony. In support of their argument, defendants refer to *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. The Supreme Court in *Doyle* held that the prosecutor's use of post-arrest silence to impeach defendant's exculpatory story told at trial violated the due process clause of the fourteenth amendment. (*Doyle,* 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.) The *Doyle* court stated that the giving of *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) to an arrestee carries an implicit assurance that silence will not be used against the arrestee at trial. (*Doyle,* 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.) Furthermore, post-arrest silence by the arrestee may be nothing more than the arrestee's exercise of his fifth amendment right and therefore, every post-arrest silence is "insolubly ambiguous" because of the *Miranda* warnings. (*Doyle,* 426 U.S. 610, 617, 49 L. Ed. 2d 91, 97, 96 S. Ct. 2240, 2244.) Based on these reasons, the *Doyle* court concluded that use of defendant's post-arrest silence is

fundamentally unfair and a deprivation of due process. (*Doyle*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245.) The Illinois courts have recognized a *Doyle* violation as plain error. (*E.g., People v. Hooker* (1977), 54 Ill. App. 3d 53, 369 N.E.2d 147; *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118.) For purposes of clarity, we will discuss the contentions of each defendant individually.

■ First, Jones maintains that the testimony of Officer O'Connor deprived him of due process by referring to his post-arrest silence. Officer O'Connor did, in fact, testify that when taken to the police station, all three defendants remained silent. O'Connor also testified that none of the defendants explained to the police that they were in Flora Collins' car to purchase marijuana. This testimony is a clear violation of *Doyle* and therefore, plain error. The State maintains, however, that the error is harmless. An error involving the denial of a constitutional right is harmless if the reviewing court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. (*People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272.) We believe the error here was harmless beyond a reasonable doubt. First, the evidence against Jones is overwhelming in comparison to the reference to his post-arrest silence by Officer O'Connor. (*Green.*) Second, there was only a single isolated reference to the defendant's post-arrest silence. This error was not compounded during the cross-examination of Jones or in the State's closing argument. (See *People v. Tice* (1977), 45 Ill. App. 3d 639, 359 N.E.2d 1228.) Third, in a bench trial, the law presumes the trial judge considered only proper and competent evidence in making its determination of guilt or acquittal. (*People v. Earl* (1966), 34 Ill. 2d 11, 213 N.E.2d 556.) Consequently, we find the *Doyle* violation to be harmless error as to Jones.

Pridgett contends that the State's cross-examination of him and the testimony of Officer O'Connor brought his post-arrest silence out before the trier of fact and therefore denied him due process of law. On direct examination, Pridgett testified that when he was arrested, he told the police he was in the car to purchase marijuana and not to rob Flora Collins. During cross-examination, the State elicited from him that when questioned by a probation officer, he chose to remain silent. Finally, Officer O'Connor, as a State rebuttal witness, testified that at the police station all three defendants exercised their fifth amendment right to remain silent.

■■ Although the State brought testimony of Pridgett's post-arrest silence before the trier of fact, no violation of the *Doyle* rule occurred. The *Doyle* court expressly recognized a set of facts where the introduction of the defendant's silence would not be error. The *Doyle* court said:

"It goes almost without saying that the fact of post-arrest silence

could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to behavior following arrest." (*Doyle*, 426 U.S. 610, 619-20 n.11, 49 L. Ed. 2d 91, 98 n.11, 96 S. Ct. 2240, 2245 n.11. See *United States v. Conlin* (2d Cir. 1977), 551 F.2d 534, *cert. denied* (1977), 434 U.S. 831, 54 L. Ed. 2d 91, 98 S. Ct. 114.)

Thus, in this case, post-arrest silence elicited during the cross-examination of Pridgett and the direct examination of Officer O'Connor was admissible to impeach Pridgett's testimony that at the time of his arrest he told the police officers his exculpatory version of the events.

Finally, we turn to the arguments of defendant Morris. Morris also contends that he was denied due process of law because the State introduced evidence of his post-arrest silence during the cross-examination of him and the direct examination of Officer O'Connor. The severity of the errors alleged by Morris warrant our recital of the critical passages from his cross-examination and Officer O'Connor's testimony. The following transpired during the cross-examination of Morris.

"Q. Do you recall going to the station?

A. Yes.

Q. What happened after you got to the station?

A. They handcuffed us to the bench.

Q. Did you talk to some people who were there?

A. No.

Q. Is it your testimony that you never talked to anybody while you were in the station?

A. Right.

          * * *

Q. Do you know that you had a right to remain silent?

A. Yes, I did.

Q. Did you remain silent.

A. Yes, I did."

Officer O'Connor's testimony involving what happened at the police station follows:

"Q. At any time did Arthur Jones, Willie Pridgett or Ronald Morris ever say anything about a drug deal going down?

A. No.

Q. Did they at any time say that Ronald Morris had given ten dollars to Flora Collins to buy marijuana and they weren't getting the good stuff?

A. No.

Q. Did they say any of those things?

A. No.

Q. As a matter of fact, what were they doing?

A. They were sitting there. They were advised of their rights."

On three separate occasions the post-arrest silence of Morris was introduced into evidence without legal justification by the State. Each instance was a violation of the *Doyle* rule and thus, plain error. We cannot imagine why the State pursued these questions nor can we permit such conduct to pass without condemnation. If these were the only errors in the record, the State may be heard to argue their harmless nature. However, these were not the only errors committed in the trial of Morris. Accordingly, we will consider the State's harmless error argument after discussing the remaining issues.

Morris next contends that he was denied a fair trial when a question asked of him on cross-examination insinuated, without proof, that he confessed to the armed robbery of Flora Collins. The following exchange occurred during the cross-examination of Morris:

"Q. Isn't it a fact, Mr. Morris, that on the date and time in question, you talked to Investigator Elam and Investigator De Mars and that you in fact confessed that you in fact had the knife on the date and time in question and you put it to the neck of Clayton Collins and ordered that victim into the car?

A. No.

Q. And confessed to the rest of the crime?

A. No.

Q. Is it your testimony that you didn't?

A. No."

Following an objection by defense counsel, the prosecutor told the trial judge she would produce the required impeaching testimony through a rebuttal witness. The State made no attempt to fulfill its pledge.

■■ Where the State in laying a foundation for impeachment insinuates the existence of prior inconsistent statements by the witness and the witness denies making the statement, the State must produce evidence that the prior inconsistent statement was made. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293.) If this were not true, a defendant would be subject to trial by insinuation and innuendo. In this case, the alleged prior inconsistent statement was the confession of Morris. We can think of no evidence more damaging than the defendant's own words of guilt. Consequently, to falsely state the existence of such a statement is to deny the defendant a fair trial and thus, plain error.

■■ Morris also maintains that his interview with probation officer Hazle was a part of his "plea discussions" with the State and therefore, his

statements made during the interview were inadmissible at trial. (Ill. Rev. Stat. 1977, ch. 110A, par. 402(f).) Morris correctly notes that a reviewing court may consider this error even if not properly preserved for appeal because of its highly prejudicial character. *People v. Steptore* (1972), 51 Ill. 2d 208, 281 N.E.2d 642; *People v. Carter* (1967), 38 Ill. 2d 496, 232 N.E.2d 692, *cert. denied* (1968), 391 U.S. 965, 20 L. Ed. 2d 877, 88 S. Ct. 2033.

Prior to trial, plea negotiations were entered into between the State and Morris. A presentence investigation report was ordered by the court upon the State's request. Morris maintains that the purpose of this report was to supply additional information which would facilitate the on-going negotiations. He considered his cooperation with the probation officer in preparing this report a necessary step in the negotiation of his sentence. During the cross-examination of Morris at trial, the State on two separate occasions asked him whether he admitted to probation officer Hazle his involvement in the armed robbery of Flora Collins. Morris denied making these statements. Probation officer Hazle, called as a rebuttal witness, testified that Morris said he, Pridgett, and Jones were robbing Flora Collins when the police arrived. Thus, on three separate occasions the State brought before the trial judge the interview between Morris and probation officer Hazle.

Supreme Court Rule 402(f) provides in pertinent part:

"If a plea discussion does not result in a plea of guilty, * * * neither the plea discussion nor any resulting agreement, plea, or judgment should be admissible against the defendant in any criminal proceeding." (Ill. Rev. Stat. 1977, ch. 110A, par. 402(f).)

Thus, the question presented is whether the interview of Morris by probation officer Hazle was a "plea discussion" under Rule 402(f). The State has cited *People v. Carter* (1968), 38 Ill. 2d 496, 232 N.E.2d 692, *cert. denied* (1968), 391 U.S. 965, 20 L. Ed. 2d 877, 88 S. Ct. 2033, for the proposition that only discussions between the defendant and the prosecutor or its staff are to be held inadmissible. We note initially that *Carter* was decided before the enactment of Rule 402(f) in 1970 and, therefore, does not control this case. Secondly, to resolve the question there presented, the *Carter* court had no need to define the limits of protected communications beyond those made with the prosecutor and its staff. Consequently, *Carter* should not be read to preclude our consideration of this question.

■■ ■ We believe a discussion of the background and function of the plea bargaining process will aid our determination of the intended boundaries of the term "plea discussion." First, plea bargaining is accepted today as an integral part of our criminal justice system. (*Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427,

92 S. Ct. 495.) Without plea bargaining, we would have to multiply greatly the number of courts, judges, and prosecutors to handle the remaining caseload. (*Santobello*, 404 U.S. 257, 260, 30 L. Ed. 2d 427, 432, 92 S. Ct. 495, 498.) As a result, the present concern of the courts and legislatures is not whether to permit plea bargaining, but how to fully utilize this mechanism and, at the same time, to ensure that the final bargain is fair and just. One step in this direction has been to bring plea negotiations into the bright light of our courtrooms for judicial scrutiny and approval. (See Ill. Rev. Stat. 1977, ch. 110A, par. 402.) In addition, once the need for plea bargaining is recognized, it becomes apparent that no properly advised defendant will fully and candidly participate in such negotiations if statements made during the negotiations may be used against the defendant when negotiations fail. Further, it would be inherently unfair to allow the State to encourage defendants to participate in plea bargaining and then, if negotiations fail, use that participation against the defendant. (See *United States v. Ross* (5th Cir. 1974), 493 F.2d 771.) In response to this problem, Rule 402(f) was enacted to protect communications made by the defendant in the bargaining process from being turned into a weapon of the State at a later trial. With this background in mind, we conclude that the term "plea discussions" encompasses statements made by the defendant with the purpose of obtaining reduction of punishment or other favorable treatment from the State in return for a plea. (See *United States v. Herman* (5th Cir. 1977), 544 F.2d 791; *Moulder v. State* (1972), 154 Ind. App. 248, 289 N.E.2d 522.) Applying this test to the present case, we conclude that statements made by Morris during the interview with probation officer Hazle were made for the purpose of obtaining a lighter sentence and were therefore inadmissible as plea discussions.

The State maintains, however, that a plea discussion cannot take place with a probation officer who lacks authority to negotiate a plea. We disagree. The twin goals of Rule 402 to encourage plea bargaining and to assure fairness to the defendant require us to find that any statements made by the defendant in pursuit of a plea agreement must be excluded, regardless of whether the defendant's efforts are misguided because the official lacked authority to negotiate a plea. (See *Herman*, 544 F.2d 791, 798.) Moreover, we cannot expect a defendant to know the exact limits of authority of each official encountered during the defendant's passage through the judicial system. We agree that where it is shown that a defendant knew the official lacked authority to negotiate a plea, then the communication falls outside the protective umbrella of Rule 402(f). In the present case, the statements made by Morris to probation officer Hazle fall within the scope of plea discussions, and their introduction into evidence constituted plain error.

Morris' final argument is that the State's introduction into evidence of his use of an assumed name was error. We cannot consider this argument because it falls short of the plain error level necessary in this case. Parenthetically, we note that the defendant's use of an assumed name has been recently held admissible by the Illinois Supreme Court. *People v. Berlin* (1979), 75 Ill. 2d 266, 388 N.E.2d 412.

In summary, we have found three instances of plain error in the trial of Morris: one, repeated reference to his post-arrest silence in violation of the *Doyle* rule; two, improper cross-examination of Morris which falsely represented that he confessed to the armed robbery of Flora Collins; and three, introduction of statements made by Morris during the plea bargaining process in violation of Rule 402(f). While we are aware of the overwhelming evidence against Morris and the presumption that a trial judge considers only proper and competent evidence, we cannot ignore the number of highly prejudicial errors committed in this case. Nor can we say beyond a reasonable doubt that these errors could not have contributed to the trial court's judgment. (*People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272.) Accordingly, the conviction of Ronald Morris is reversed and remanded. The convictions of Arthur Jones and Willie Pridgett are affirmed.

Reversed and remanded in part; affirmed in part.

SULLIVAN, P. J., and MEJDA, J., concur.