THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RAYMOND K. BROWN, Defendant-Appellant.

First District (5th Division)    No. 80-1349

Opinion filed June 25, 1982.

James J. Doherty, Public Defender, of Chicago (Gerald T. Winiecki and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Martin D. Reggi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendants Raymond and Lori Brown were convicted of indecent liberties with a child. (Ill. Rev. Stat. 1977, ch. 38, par. 11—4.) The trial court sentenced Raymond Brown[1] to 5 years imprisonment and Lori Brown to a period of probation. On appeal, defendant contends that: (1) the prosecutor committed reversible error by eliciting testimony from complainant as to psychiatric treatment she received after the charged offense, by eliciting testimony of other offenses allegedly committed by defendant, and by inquiring on cross-examination about the contents of allegedly pornographic films that had been specifically excluded from evidence by the trial judge; (2) the court committed reversible error in barring the defense from introducing testimony that complainant had previously claimed to a friend that she had engaged in sexual intercourse with the devil; (3) defendant was deprived of effective assistance of counsel through trial counsel's failure to move to suppress evidence seized in defendant's apartment during a warrantless, nonexigent arrest and search; and (4) defendant was not proved guilty beyond a reasonable doubt.

On February 1, 1978, complainant, Rebecca B., who was then 13 years old, was taken to the psychiatric ward of a hospital by her mother. She called police, who were not able to speak to Rebecca until February 20, 1978, because of her hospitalization. Upon investigation of complainant's charges against defendants police conducted a surveillance of defendants' apartment from April 1 to April 5, 1978.

On the evening of April 5, 1978, five police officers knocked on the door of the Browns' apartment and announced their office. When Raymond Brown answered the door the police asked his name and then arrested him and advised him of his rights. They also arrested Lori Brown, who was present in the apartment. They searched the apartment and recovered several pornographic films, a projector, and various sexual devices. A police evidence technician then photographed the kitchen, bathroom, and bedroom. The Browns were charged with having committed indecent liberties with complainant on January 6, 1978.

At trial, Rebecca testified that in September of 1977 she was living with her mother. She met defendants in October of that year when she went to their apartment with a schoolmate, known as Nina B., to babysit.

---

[1] This appeal is only by Raymond Brown.

Two weeks later, Rebecca returned to the apartment with Nina and she started going to the Browns' apartment once or twice a week.

Complainant further testified that in mid-November of 1977, she was in the Browns' apartment with Nina, Raymond, and Lori Brown, talking and smoking reefers. The four of them went into the bedroom and watched a film, "Snow White," and then a pornographic film. After the film, Raymond and Nina had sexual intercourse on the bed while she and Lori Brown were also on the bed.

Rebecca further testified that she and Raymond had sexual intercourse and then Raymond had intercourse with Nina again. Complainant stated that she went to the apartment three or four times a week between mid-November and January 6, 1978, and stayed overnight 2 or 3 nights a week. On those nights Raymond, Lori, and Nina were also present. Rebecca further testified that she had sexual relations with Lori Brown prior to January 6, 1978. On the evening of January 6, 1978, she and Nina, Raymond, Lori, and another girl, were drinking and smoking reefers when Raymond showed them some pornographic films in the bedroom. Rebecca testified that she had seen such films 20 or 25 times before. The prosecution then showed the jury one of the films, which the complainant identified as one that she had seen at the Browns' apartment on January 6, 1978 and other times.

Rebecca testified that after the movies were shown, Nina had sexual intercourse with Raymond and then she did also. Then Raymond and Nina performed acts of oral sex, after which Raymond put on a dildo and penetrated Nina's vagina and anus. After that, Raymond directed Nina and then Rebecca to put their mouths on his penis. Then Lori Brown put her mouth on Nina's vagina and then Rebecca's. Raymond and Lori performed other sexual acts that day. Complainant testified that she left the next day and never returned, although Raymond and Lori telephoned and asked her to return.

Further testifying, Rebecca stated that she went to school on February 1, 1978, and that her mother removed her from school and took her to Illinois Masonic Hospital, where she stayed for two weeks in the psychiatric ward. Over defense objections, Rebecca stated that she was currently receiving psychiatric treatment but that she had not been receiving it prior to February 1, 1978.

Complainant identified several photographs of the Browns' apartment and the projector used to show the films.

On cross-examination, Rebecca testified that from October of 1977 to January 6, 1978, Nina was living with the Browns. She denied that she was in love with Nina and denied that she had asked Nina to live with her and her mother. Defense counsel asked Rebecca if she were a witch and she answered in the negative before the court sustained the State's objection.

Counsel attempted to further inquire along the same lines but the court again sustained objections. During a conference outside of the jury's presence, the court ruled that the questions were irrelevant and improper.

In further cross-examination, Rebecca testified that she had had a social worker during the time she was going to the Browns' apartment but that she never told the social worker about the Browns. To explain her absences from school so she could go to the Browns, Rebecca wrote notes that were supposed to be from her mother. She admitted that the notes contained lies. She did not tell her mother about the occurrences at the Browns' apartment.

Next to testify was Chicago police officer Patrick Deady, who had spoken to complainant's mother on February 1, 1978, and then had begun the investigation. Officer Deady talked to complainant on February 20, 1978, and a few weeks later he interviewed Lisa A. and Nina B. Subsequently he began the surveillance of the Browns' apartment. On April 5, 1978, he and four other officers arrested Raymond and Lori Brown in their apartment. He found a projector, sexual devices, reams and films in the bedroom. He saw dirty clothes, garbage, and excrement strewn around.

He further testified that one of the officers thoroughly searched the apartment, recovering 41 films, some cartoons and some adult pornography. Further, Officer Deady stated that complainant had told him that she had engaged in sexual relations with the Browns 70 or 80 times.

The State introduced into evidence, over defense objection, the film identified by complainant and viewed by the jury, two photographs of the bedroom, and the projector. The court did not allow into evidence six photographs of the apartment, stating that they had no probative value, nor did the court admit several films recovered from the apartment. The State then rested.

The first defense witness was Nina B., 15 years old at the time. She had known Raymond and Lori Brown for 4½ years and had introduced Rebecca to them. From October 1977 to January 1978 Nina lived with the Browns. She testified that during that time Rebecca would come over to watch TV or listen to the radio and occasionally spent the night. She further testified that at the beginning of November 1977, Rebecca asked her to live with her, but Nina declined. Approximately a month later, complainant again asked her and when she refused, threatened to make trouble for the Browns. Nina then told Rebecca to leave the house and that she no longer wanted to be friends.

Testifying further, Nina said that she did not see Rebecca again until a couple of days before Christmas vacation, when Rebecca apologized. Nina then invited Rebecca to a Christmas Eve party at the Browns'

apartment. During the party, Rebecca told Nina that she loved her and wanted to make love to her. Nina was shocked and left the room. Since that night, Nina stated, she has not spoken to Rebecca.

Nina denied that the Browns ever showed her stag films or gave her wine or marijuana. On one occasion when the Browns were out, Rebecca found a film and they watched it. Nina denied that she or Rebecca ever had sexual relations with Raymond or Lori Brown and further stated that at school Rebecca had a reputation as a liar.

On cross-examination Nina stated that she had lived with the Browns from October of 1977 to January 1978. She did not know if they were married and had only seen their bedroom one time. She also stated that Rebecca had visited the house only 3 or 4 times and had never spent the night.

Nina further testified that a caseworker from the Department of Children and Family Services removed her from the Browns' home in mid-January 1978. She denied that Rebecca had come to the apartment on January 6, 1978. Further, she testified that upon questioning by police officers in April of 1978 she told a female officer that complainant had said that she would "get" the Browns. Nina denied telling the officer that she had seen pornographic films, taken speed, grass and downers. Nina further denied telling the police officer that she had performed sex acts with Raymond Brown or that he had asked her to make pornographic movies or be a prostitute. She further denied telling the female officer that Raymond Brown had threatened to kill her if she told anyone about it.

Lori Brown next testified for the defense. She denied ever showing stag films to Rebecca or having sexual relations with her or giving her wine or marijuana. To her knowledge, Raymond had never had sexual relations with Nina or Rebecca.

When questioned about her arrest on April 5, 1978, Lori testified that when she went to answer the doorbell a police officer "showed his badge and identified himself and was followed into my home by several other police officers and policewomen." They told the Browns they were under arrest and then "a couple of police officers started going through [their] home pulling things out of the closet, emptying drawers." She also testified that the photographs of the apartment were taken after the police had pulled things out of the closets and drawers. Lori admitted that Raymond kept stag films and sexual devices in their home.

On cross-examination Lori testified that she had met Raymond Brown in 1975 when she was 16 and he was approximately 43. They did not marry but started living together. They had a child in June 1976. Lori testified that she and Raymond looked at adult films alone. She also

admitted that they had dildos and various sexual devices. She also testified that other young girls came over to the apartment during the period of October and November 1977.

Raymond Brown next testified that he was 48 years old and that in 1977 he lived with his "wife" and daughter. He had seen Rebecca a couple of times at the apartment but had not talked to her. He denied that there had been any marijuana or liquor in his home from 1975 through the present and explained that he was a recovering alcoholic who had not had a drink since 1967. He denied having sexual relations with Nina or Rebecca.

On cross-examination Brown admitted that he and Lori were not married and denied that any of the films in his home were of child pornography. Defense counsel objected to questions regarding the contents of the films and the court sustained the objections. Defendant moved for a mistrial but the court denied it and told the jury to disregard the two questions involving specific films.

On redirect examination, Raymond stated that when the police came to arrest him they pushed him down on the couch and started "tearing everything up." They went through drawers, cabinets, and the refrigerator and told Raymond they were looking for marijuana. He also testified that he was handcuffed.

In rebuttal the State called Officer Rosemary Burzinski, who stated that on March 20, 1978, she had spoken with Nina, who told her that she had had sexual intercourse with Raymond approximately 50 times and also with Lori; that Raymond had promised to send Nina to Las Vegas or California for purposes of prostitution, and that when she would arrive there men would buy her clothes and take care of her. Further, Nina told Officer Burzinski that Raymond had warned her not to tell anyone. Further, Nina had told Officer Burzinski that during November 1977 to January or February 1978 the Browns would show pornographic movies, give her and Rebecca speed, marijuana, and have sexual intercourse with them.

After both sides rested and the attorneys gave their closing arguments, the jury found the Browns guilty of indecent liberties with a child. Raymond was sentenced to five years imprisonment and Lori to probation.

OPINION

Defendant specifies certain trial errors that he contends denied him a fair trial. First, he argues that the prosecutor erroneously elicited testimony from Rebecca that she was receiving psychiatric treatment and then underscored the point by commenting in closing argument that "she sees a therapist because of what went on [at the Browns' apartment]." For support, he cites *People v. Gillman* (1980), 91 Ill. App. 3d 53, 414 N.E.2d

240, where the court held that it was reversible error to allow the prosecution to present evidence that the victim of a sex offense had undergone psychiatric treatment and also to elicit the cost of such treatment. The *Gillman* court noted that the testimony was irrelevant to the issue of defendant's guilt or innocence and was merely an attempt by the prosecutor to elicit the jury's sympathy and to prejudice defendant. The conviction was reversed for several errors and remanded for a new trial.

The facts of the present case, however, are distinguishable from *Gillman*. The transcript reveals that the matter of complainant's psychiatric treatment was not brought out by the State to elicit jury sympathy. Defense counsel's initial objection to the testimony regarding her treatment apparently was based on his desire to subpoena the hospital's records for information regarding the therapy she received during her hospitalization after leaving Illinois Masonic Hospital. He said, "She testified about it and I am entitled to that material." The following colloquy then transpired outside of the jury's hearing:

"MR. DiBENEDETTO [Assistant State's Attorney]: Judge, this matter came up two days ago about psychiatric treatment.

THE COURT: Right.

MR. DiBENEDETTO: Mr. Gilman [defense attorney] stated two days ago he had information that this witness was receiving psychiatric treatment prior to her involvement in this case.

MR. GILMAN: That's right.

MR. DiBENEDETTO: That, in fact, is false. She was not. Now, I think she has a right and the jury has a right to know whether she received treatment, whether she still is and it has nothing to do with the records he's talking about.

THE COURT: You must ask her a question and I will permit you to ask her. All she is going to testify to is she went to the hospital on this date and she entered a course of therapy. You must ask her, prior to this date, had you ever had any psychiatric treatment.

MR. DiBENEDETTO: Prior to—

THE COURT: To this, prior to the date.

MR. GILMAN: February.

MR. DiBENEDETTO: Sure, I will ask her.

MR. GILMAN: Now, how long, how much—

THE COURT: That is all.

MR. DiBENEDETTO: Can I ask her if she is still undergoing treatment today?

MR. GILMAN: No.

THE COURT: You can ask her, did you embark upon a course

of treatment? Yes. Are you still receiving treatment? Yes. I will let you go that far.

\* \* \*

MR. GILMAN: I have an objection. She is still receiving \* \* \* therapy and then I believe, Your Honor, I am entitled to have the child examined \* \* \*.

THE COURT: Obviously, \* \* \* she is a competent witness. She is as competent as can be.

MR. GILMAN: This is not for you or I to determine.

THE COURT: The point is that is for me to determine."

The defense attorney continued to assert that he had a right to have complainant examined, but the court ruled that she was competent to testify.

■■ From this excerpt it appears that defense counsel was initially concerned with her history of treatment and whether she had received psychiatric care before, but not after, her admission to Illinois Masonic Hospital in February 1978. Since the defense theory of the case was to discredit complainant as a mixed-up, fantasizing child, defense counsel was willing to have her former history of psychiatric treatment brought out. Now, defendant argues on appeal that it was prejudicial error to allow her to testify that she received treatment after the sex offense occurred because it would inflame the jury. We are not persuaded by this argument. Defense counsel's objection at the time was not seemingly based on the possibility of jury sympathy, but rather was based on his desire to subpoena hospital records and to have complainant examined regarding her mental capacity to testify.

■■ We further find that the prosecutor's comment in closing argument that Rebecca was seeing a psychiatrist "because of what went on" at the Browns' home does not constitute reversible error. Defense counsel did not object to the comment and the prosecutor did not further emphasize the point. In view of the fact that defense counsel argued that Rebecca was an unstable child who lied or fantasized, moreover, we do not believe the jury's knowledge of her psychiatric treatment is prejudicial to defendant.

Defendant's second point of alleged trial error involves testimony regarding other offenses that he might have committed. On cross-examination of Nina B., the State asked if she had told Officer Burzinski that Brown had asked her to make pornographic movies, to engage in prostitution, and to keep quiet about it or he would kill her. Nina denied this and the State brought in Officer Burzinski as a rebuttal witness. She directly contradicted Nina's testimony by relating that Nina had told her about those matters and had admitted to being "petrified" of Raymond

Brown. Defendant now argues that this evidence should not have been admitted because it implied to the jury that he had committed the crimes of solicitation for prostitution and intimidation. Consequently, defendant maintains he was unfairly prejudiced. We disagree with this contention also.

■■ Evidence that a defendant has a "bad character" or has committed other crimes is inadmissible to show that a defendant was more likely to have committed the crime on trial; the prejudicial impact of such evidence outweighs any probative value. (McCormick, Evidence Sec. 190, at 447 (2d ed. 1972).) This rule of exclusion does not apply, however, if the evidence is substantially relevant for some other purpose than to show his criminal "propensity." (McCormick, Evidence Sec. 190, at 449 (2d ed. 1972); *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) For example, evidence of a defendant's other crimes is commonly admitted to show his motive, intent, or *modus operandi. (People v. Romero.)* In the present case the alleged conversation between Raymond Brown and Nina was not introduced to show that defendant had a propensity to commit crime but instead, to impeach one of defendants' key witnesses through her prior inconsistent statements. As such, the State's use of Officer Burzinski's testimony, after laying a foundation through cross-examination of Nina, was proper. (See *People v. Moore* (1973), 54 Ill. 2d 33, 294 N.E.2d 297; *People v. Morris* (1979), 79 Ill. App. 3d 318, 398 N.E.2d 38.) Therefore, the court did not abuse its discretion in admitting this evidence.

■■ We further note that defense counsel did not object to the admission of the evidence or move to strike it; this failure deprived the court of the opportunity to rule on any alleged error and thus operates as a waiver. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

We also find meritless the argument that the prosecutor committed reversible error in cross-examination of Raymond by inquiring about the contents of certain films that had been excluded from evidence by the court in a motion *in limine.* Of the 41 films taken from defendants' apartment Rebecca identified one at trial, which was shown to the jury. The trial court ruled that the rest of the films would not be admitted into evidence, but also ruled that the State could refer to the fact that other films had been recovered in the search of the Browns' apartment. Defendant challenges the following excerpt from the trial:

> "STATE [to defendant Raymond Brown]: Now, there are some films in [your apartment] of child pornography, aren't there?
> DEFENSE COUNSEL: Objection, your Honor.
> THE COURT: Sustained.
> THE WITNESS: No, there isn't.

THE COURT: When I sustain an objection do not answer.

THE PROSECUTOR: Well, there is a film in there of a woman having intercourse with a pig?

DEFENSE COUNSEL: Objection your Honor.

THE COURT: Sustained."

The court told the jury to disregard the questions and denied defendants' motion for a mistrial.

■■ We agree with defendant that the prosecutor's two questions were improper because there was no evidence of the specific contents of the unadmitted films; however, we hold that the questions did not result in reversible error. Generally, improper comment or argument will not result in reversal of a conviction unless it can be viewed as a material factor in the conviction or results in substantial prejudice to defendant. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 46, 308 N.E.2d 92.) In the present case, we do not believe that defendant was substantially prejudiced by the two isolated questions on the contents of films not in evidence. Realistically, the jury was already aware of the defendants' ownership of sexual devices and "adult films"; Lori Brown had already admitted as much. The jury had also viewed one of the films and accordingly had an indication of what similar films might conceivably contain. We doubt that the prosecutor's reference to two other films swayed the jury or was a material factor in defendants' convictions. Moreover, the judge sustained the defense objections, after Brown had denied the first question, and told the jury to disregard them. He admonished them to put the questions out of their minds "because it [was] not a part of the case." We believe that this operated as a cure of the error. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200.) Furthermore, the trial court is in the superior position to evaluate the impact of challenged questions or comments (*People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 121, 390 N.E.2d 1339) and we conclude that the court properly denied the motion for a mistrial. Therefore, since the error was cured and resulted in no substantial prejudice, it was harmless error and did not deprive defendant of a fair trial.

Next, defendant contends that the trial court committed reversible error by refusing to allow defense counsel to explore complainant's alleged dealings in witchcraft or devil worship. Defense counsel had asked Rebecca, during cross-examination, whether she was a witch or had told anyone that she was. The State objected and she denied it. After defense counsel attempted to further inquire along the same lines, the court allowed the parties' counsel to have a side bar conference out of the jury's presence. The court asked defense counsel what was the relevance of his line of inquiry and he responded that the complainant was a "disturbed kid" who was "nuts" long before January 6, 1978. He further

stated that Rebecca went through "a whole devil worship scene" with Nina and another girl. Defense counsel made an offer of proof to indicate that complainant had told two persons that

"she was a witch and that she had at one time put a spell on a dude to make him have a car accident. That she also had a book of chance and a book of spells and that she brought out a black robe with a hood on it, wore it and made all kinds of funny noises.

She said that her mother has got a red robe and that they were going to some devil worship and also that she made love with the devil. This is what—."

The prosecutor interrupted to ask for a foundation and the court asked defense counsel how it was material or relevant. Counsel replied that Rebecca was a "weird kid" who "lies and fabricates and * * * has a very vivid imagination * * *. It goes to her credibility." The court ruled that the proposed testimony was not relevant to the pending lawsuit and refused to let counsel pursue it.

We disagree with defendant's contention that the trial court abused its discretion in limiting cross-examination of complainant. Without revealing who the witnesses were that would testify, and without giving a foundation as to the circumstances, defense counsel's offer of proof merely alleged that Rebecca had told one person that she was a witch who had put a spell on someone, and that she had a hooded robe and occult books. We do not find this material to any issue in the case. Once the court determined that she was competent to testify, it was for the jury to evaluate the credibility of her testimony against the Browns.

Defendant, however, relies on *People v. Morgan* (1976), 44 Ill. App. 3d 730, 358 N.E.2d 909, *aff'd* (1977), 69 Ill. 2d 200, 370 N.E.2d 1063, to support his position that evidence of a complaining witness' prior statements which show a "propensity to fabricate" are relevant and admissible. In *Morgan*, defendant's conviction for indecent liberties with a child was reversed because the appellate court found that "the evidence taken as a whole [did] not create an abiding conviction that the defendant [was] guilty of the crime charged." (44 Ill. App. 3d 730, 734.) The court noted several inconsistencies and flaws in the 7-year-old's testimony, and further found that her credibility was undermined by the testimony of her teacher, to whom the complainant had given a version of the alleged incident. She had named a perpetrator other than defendant and had also given her teacher a description of the events that did not correlate with what she had told a police officer. The *Morgan* court went on to note that the teacher also testified regarding other stories the child had told which indicated her "propensity" to fabricate.

■■ We do not find the *Morgan* case analogous to the one at bar. In *Morgan* the impeachment of the complainant's credibility occurred

largely as a result of inconsistencies in her own story of the occurrence to different witnesses. In the pending case, however, the witchcraft accusation does not relate to the crime charged. Moreover, we need not speculate as to the *Morgan* court's reasons for admitting testimony regarding the complainant's prior false statements because it does not appear from the opinion that the admissibility of such evidence was ever in issue. We conclude that the trial court in the pending case did not abuse its discretion in refusing to allow the defense to introduce supposed evidence of Rebecca's witchcraft or devil worship.

Defendant further argues that he was deprived of effective assistance of counsel because of trial counsel's failure to move to suppress evidence seized in the apartment during a warrantless, nonexigent arrest and search.

To be granted a new trial, defendant must establish his trial attorney's "actual incompetence" that resulted in "substantial prejudice" of the type that probably changed the outcome of the trial. *People v. Carlson* (1980), 79 Ill. 2d 564, 584-85, 404 N.E.2d 233.

"The question of illegal search and seizure even though pursuant to an illegal arrest will not ordinarily be considered on appeal where not raised in the trial court. [Citations.]" (*People v. Harter* (1972), 4 Ill. App. 3d 772, 775, 282 N.E.2d 10.) The issue is considered waived because the appellate court cannot review the reasonableness of a search and seizure unless it has been put in issue by defendant's motion to suppress. The prosecution is not ordinarily required to offer proof of reasonableness unless the defense raises it at trial. (*People v. Mitchell* (1979), 78 Ill. App. 3d 851, 397 N.E.2d 569.) Thus, when the search is challenged on appeal by way of an accusation of trial counsel's incompetency for failure to move to suppress, the record may not be complete enough to allow the reviewing court to rule on the validity of the challenged search. *People v. Mitchell.*

■■ In the pending case we cannot ascertain what would have been the result of a hearing on a motion to suppress. The validity of the arrest itself was not challenged at trial, nor does the appellant's brief seriously contest it. While the record does not contain warrants for the Browns' arrest and for the subsequent search, the officers apparently were allowed into the Browns' apartment voluntarily. Even absent an arrest warrant, an officer can effect a valid arrest of persons in their home if he has probable cause and either (1) exigent circumstances exist (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371), or (2) "voluntary consent is given to enter [the] residence." (*People v. Bean* (1981), 84 Ill. 2d 64, 69, 417 N.E.2d 608.) We cannot presume that the arrest was invalid, and therefore hold that any error in connection with the arrest was waived.

Regarding the search of the Browns' apartment, the record indicates that officers checked each room and recovered various items. Defendants argue that the scope of the search far exceeded that which would have been properly incident to a lawful arrest. Defendant Raymond Brown testified that the officers, in effect, "ransacked" the apartment, pulling out drawers and going through closets. Officer Deady, on the other hand, testified that when he entered the rooms of the apartment he observed, in addition to garbage and dirty clothes, a projector and sexual devices on the dresser and bed. Hence, there is a conflict as to whether the items taken as evidence were in plain view or were ferreted out by the police in an overly broad search of the premises.

■■ In view of the inconclusive nature of the testimony we cannot assume that the search was unlawful. Moreover, even if it was, an attorney's failure to make a motion to suppress is not *per se* incompetence. (*People v. Mitchell.*) The Illinois Supreme Court has recognized situations in which counsel's failure to file such a motion is insufficient to show such incompetence as would prevent the operation of the waiver rule. (See *People v. Moore* (1969), 43 Ill. 2d 102, 106, 251 N.E.2d 181; *People v. Washington* (1968), 41 Ill. 2d 16, 20-21, 241 N.E.2d 425.) Under the circumstances of the present case we find that even if counsel's failure to make the motion is viewed as "actual incompetence" under the relevant standard, defendant was not so prejudiced by it as to require a new trial. The only evidence admitted as a result of the search was one film and a projector. Had those items been suppressed the jury still would have heard complainant's testimony regarding the films and sexual devices. It has been held that where erroneously admitted evidence does not prove any element of the crime not established by other properly admitted evidence, the error did not contribute to the finding of guilt and is harmless. (*People v. Bacon* (1980), 91 Ill. App. 3d 673, 415 N.E.2d 678.) Defendant also admitted to having the films and other items in his apartment. Therefore, even assuming the search was nonconsensual and overbroad in scope, it would not appear that the resulting admission of the film and projector caused substantial prejudice to defendant that would have probably changed the jury's verdict. Accordingly, we hold that defendant has not established that his trial counsel's performance deprived him of a fair trial.

Finally, defendant urges this court to reverse his conviction because he was not proved guilty beyond a reasonable doubt. He cites *People v. Kolden* (1962), 25 Ill. 2d 327, 185 N.E.2d 170, for the proposition that where a conviction for taking indecent liberties with a child depends on the testimony of the prosecuting witness, there must be substantial corroboration of her testimony, or the testimony must be otherwise clear and

convincing. In *Kolden* defendant's conviction of rape and indecent liberties was reversed by the supreme court because the 9-year-old complainant's testimony that defendant had "put his finger in [her] private" was completely discredited on cross-examination when she admitted that she did not know what "privates" were, she did not know what she meant by her own testimony, and she was only saying what the lawyer told her to say. Other evidence further impeached complainant's story, and there was no evidence to corroborate her story. Since her testimony was not otherwise clear and convincing, the court reversed the conviction.

■■ We disagree with defendant's contention that Rebecca's testimony was inherently implausible and thoroughly contradicted, as was the situation in *Kolden*. Rebecca's clear testimony against the Browns was not substantially shaken on cross-examination. Moreover, although the evidence of defendants' sexual devices and "adult" films may not directly corroborate the charge of indecent liberties with a child, it is relevant to Rebecca's veracity because it indicates that she did not fantasize or fabricate the existence of the items. Defendants, of course, denied her allegations and accordingly the jury had to determine whom to believe. The only other defense witness, Nina, as previously noted, was impeached by Officer Burzinski's testimony. Finally, although defendant emphasizes that Rebecca admitted that she had fabricated notes from her mother to excuse her absences from school, we do not agree that this proves that she was probably lying in her testimony against the Browns. Accordingly, we hold that the evidence was sufficient for the jury to find, after judging the witnesses' credibility, that defendant was guilty of the offense beyond a reasonable doubt.

We affirm the judgment.

Affirmed.

LORENZ and MEJDA, JJ., concur.